IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 2000

# STATE OF TENNESSEE v. MICHAEL F. MARASCHIELLO

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 35643      Robert W. Wedemeyer, Judge**

---

**No. M1997-00049-CCA-R10-CD - Filed July 28, 2000**

---

The appellant, Michael F. Maraschiello, was convicted by a jury in the Montgomery County Circuit Court of first degree murder, arson, possession of an explosive weapon, possession of a shotgun with an altered serial number, and theft. For the offense of first degree murder, a jury imposed a sentence of life imprisonment in the Tennessee Department of Correction. Additionally, the trial court imposed a sentence of two years incarceration in the Department for the offense of arson, two years incarceration in the Department for the offense of possession of an explosive weapon, six months incarceration in the Montgomery County Workhouse for the offense of possession of a shotgun with an altered serial number, and six months incarceration in the workhouse for the offense of theft. The trial court ordered that the appellant serve his sentences consecutively. On appeal, the appellant presents the following issues for our review: (1) whether the trial court erred in refusing to suppress the appellant's confession to the police; (2) whether the trial court committed reversible error in permitting the State to call the appellant's accomplice, Timothy Winston, to the witness stand in light of Mr. Winston's stated intention to invoke his privilege against self-incrimination; (3) whether the trial court erred in excluding testimony concerning "Gulf War Syndrome;" and (4) whether the trial court erred in imposing consecutive sentencing. Following a review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

Clifford K. McGown, Jr., Waverly, Tennessee, and Debra Wall, Clarksville, Tennessee, for the appellant, Michael F. Maraschiello.

Paul G. Summers, Attorney General and Reporter, Elizabeth T. Ryan, Assistant Attorney General, and Arthur Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Factual Background**

The appellant's convictions of premeditated and deliberate first degree murder, arson, possession of an explosive weapon, possession of a shotgun with an altered serial number, and theft arose from the planned slaying of his estranged wife, Roxie Maraschiello, on February 16, 1995, at her home in Clarksville, Tennessee. At the time of the murder, the appellant and Ms. Maraschiello had been married for approximately ten years and had two daughters, who were eight and four years old. During the marriage, the appellant served in the United States Army, ultimately attaining the rank of captain and commanding a company during the Persian Gulf War.[1] According to the appellant, Ms. Maraschiello experienced some difficulty in adjusting to the role of an officer's wife. Moreover, the appellant testified at trial that his relationship with his wife was adversely affected by her claims that she had been raped by a prior husband and her consequent psychological problems. The appellant explained that he "became obsessed somewhat and upset at Roxie and pretty much went into a mode that I felt I had married a - - someone who needed more care and help than I did or had some major problems." The appellant further stated that he carried "a grudge . . . against Roxie because what she was doing wasn't acceptable in terms of a normal relationship . . . [p]hysical . . . and emotional . . . ."[2]

In 1992, following the Persian Gulf War, the appellant was assigned to Fort Campbell, near Clarksville, Tennessee. While at Fort Campbell, the appellant began to receive poor performance evaluations. Additionally, his relationship with his wife further deteriorated. According to the appellant, his wife increasingly neglected family activities and responsibilities and pursued a social life apart from her husband and her children. The record also reflects that, in March 1993, Ms. Maraschiello filed a complaint with the Fort Campbell Family Advocacy Program, alleging physical and mental abuse by the appellant. Ms. Maraschiello subsequently submitted affidavits to the Family Advocacy Program, drafted with the appellant's assistance, recanting the allegations.

In the summer or fall of 1993, the appellant received an honorable discharge from the Army. Following his discharge, the appellant continued to serve in the United States Army Reserve and also obtained employment with the Nashville Metropolitan Police Department. Psychological evaluations performed in connection with the appellant's application for employment with the police department revealed no significant "psychopathologies," although examining psychologists noted "a defensive gruffness that bordered on anger" and "some adjustment problems and behavior traits which cause [the appellant] difficulties in relating to others . . . ." Indeed, while attending the police academy, the appellant was the subject of several disciplinary actions. Moreover, following the

---

[1]The appellant apparently served with some distinction during the Persian Gulf War, earning both the Air Medal and the Bronze Star Medal.

[2]The appellant testified at trial that, several months prior to the murder, he spoke with Ms. Maraschiello's ex-husband and became convinced that his wife had lied about the rape and feigned psychological problems in order to manipulate him.

appellant's graduation from the police academy, his training officers noted that the appellant resisted following orders and had difficulty drafting objective incident reports. Master Patrol Officer James Sullivan explained that the appellant was

> constantly argumentative about anything that you tried to teach him. He had his own ideas of how things should be done even though they might not have been to departmental standards or anybody else's standards. . . . He wouldn't accept any type of criticism or any type of supervision.

The police department terminated the appellant's employment in 1994.

Subsequently, the appellant was unable to maintain steady employment, and the Maraschiellos' precarious financial circumstances created additional tensions between the appellant and his wife. Ultimately, on October 28, 1994, Ms. Maraschiello initiated divorce proceedings in the Davidson County Circuit Court. On October 29, 1994, the appellant in turn filed a petition for an order of protection in the Davidson County General Sessions Court, alleging that his wife had previously threatened to kill him and that she owned a .25 caliber pistol. Finally, on November 1, 1994, the appellant's eldest daughter reported to school authorities that the appellant had been sexually abusing her. Detective Steve Cleek of the Nashville Metropolitan Police Department recounted at the appellant's trial that he investigated the allegations in conjunction with the Tennessee Department of Human Services[3] but discontinued the investigation on January 4, 1995, due to insufficient evidence.

Following the initiation of divorce proceedings and the child sexual abuse investigation, Ms. Maraschiello moved with her daughters from the Maraschiellos' Nashville residence to a trailer located in Clarksville, in Belle Glade Trailer Park. Ms. Maraschiello refused to divulge her address to the appellant. Moreover, on December 15, 1994, the Davidson County Circuit Court ordered that a restraining order "remain in place as to both parties which shall restrain both parties from in any way harassing each other or from in any way physically assaulting each other or making threats of violence to each other." However, due to "insufficient competent proof . . . of child sexual abuse," the court granted the appellant unsupervised visitation with his daughters on alternate weekends.

At his trial, the appellant denied abusing his children. He further stated his belief that his wife had forced his eldest daughter to accuse him of sexual abuse. According to the appellant, his wife was herself abusing the children, sexually and otherwise. Additionally, the appellant believed that his wife was unfaithful to him during their marriage. These beliefs prompted the appellant's decision to murder his wife and "rescue the children."

In January of 1995, the appellant approached an acquaintance, Timothy Winston, and offered to pay him ten thousand dollars if he would assist the appellant in murdering Ms.

---

[3]In 1996, the Department of Human Services was replaced by the Department of Children's Services. See Tenn. Code Ann. § 37-5-101 (1996).

Maraschiello. Mr. Winston agreed, whereupon the appellant paid him five thousand dollars, and the two conspirators began to formulate a plan.[4] On February 1, 1995, the appellant purchased the murder weapon, a Mossberg ".12 gauge pump shotgun," removing the serial number with a drill and "shortening the stock and barrel length." On February 9, 1995, the appellant stole a "Ford LTD four-door" vehicle, which he planned to use for transportation during the commission of the murder. He additionally stole a license plate from another vehicle and affixed the license plate onto the stolen Ford. Finally, anticipating the need to destroy the stolen Ford following the murder, the appellant prepared two incendiary devices, consisting of "M80 firecrackers" and fuses attached with duct tape to bottles of gasoline. The appellant also attached "military heat tablets" to the sides of the bottles.[5]

On the night of February 16, 1995, the appellant placed the shotgun, ammunition, binoculars, a "scanner" capable of monitoring Clarksville police radio frequencies, and the incendiary devices into the stolen Ford and drove to the Queen City Barber College in Clarksville, where Ms. Maraschiello was employed. The appellant was wearing a "pony tail wig" and a ski mask. Mr. Winston followed the appellant in a Peugeot station wagon. Mr. Winston was also carrying a police scanner in his vehicle in addition to a change of clothing for the appellant.

The appellant and Mr. Winston approached the barber college at approximately 10:00 p.m. and observed Ms. Maraschiello driving out of the parking lot. They began to follow her, but Mr. Winston soon became separated from both the appellant and his wife. The appellant, however, successfully followed Ms. Maraschiello to the Belle Glade Trailer Park.

Several people, including Ms. Maraschiello's roommate, Linda Hubenthal, and Ms. Maraschiello's boyfriend, Tommy Piper, were inside Ms. Maraschiello's trailer, awaiting her return from work. The Maraschiellos' daughters were asleep in a rear bedroom of the trailer. Ms. Hubenthal and Mr. Piper heard Ms. Maraschiello arrive home and attempt to open the front door of the trailer. However, the security chain was fastened. Accordingly, Ms. Hubenthal went to the front door to unfasten the chain. Mr. Piper testified at trial that, before Ms. Hubenthal could unfasten the chain, someone outside said, "[W]hat the hell do you want." Mr. Piper then heard loud noises that "sounded like fireworks going off." Several bullets penetrated the front door and the walls of the trailer, and Mr. Piper observed "some stuff fly past [his] face." During the shooting, Ms. Hubenthal

---

[4]The appellant confessed to police that he hired Mr. Winston to assist him in murdering his wife. At trial, in contrast, the appellant denied that Mr. Winston participated in the planning and execution of the murder. The appellant did admit that, upon his discharge from the Army, he received a substantial amount of "separation pay." Moreover, he admitted that, on November 2, 1994, he cashed a check amounting to $2,700 and that, prior to the murder, he used a credit card issued by Nations Bank of Delaware to obtain large cash advances. However, he explained that he was paying an attorney to represent him in the pending divorce proceedings. Moreover, he asserted that, at some point, he was denied access to his bank accounts due to the divorce proceedings.

[5]A military heat tablet is a "small compressed block of fuel" that military personnel employ in the field in order to heat their food.

and Mr. Piper overheard Ms. Maraschiello screaming for help.

> In a statement to the police, the appellant recalled that, when [my wife] pulled into . . . [her] driveway, I pulled in behind her, T-style. I got out with the shotgun and followed her to the porch, aimed the shotgun and pulled the trigger and it delayed for a second before discharging. The first shot missed and hit the door. I then shot her three or four more times. I was at a distance of about fifteen feet.

Ms. Maraschiello died as a result of shotgun wounds to the head, chest, and abdomen. Dr. Charles Warren Harlan, an expert in forensic pathology, opined at the appellant's trial that a shotgun wound to Ms. Maraschiello's abdomen was inflicted from a distance of ten (10) or twenty (20) feet. A shotgun wound to Ms. Maraschiello's chest was inflicted from a distance of six (6) feet or less. Finally, the shotgun wound to Ms. Maraschiello's head, involving the removal of the left frontal lobe of her brain, appeared to be a "contact wound," inflicted when the muzzle of the shotgun was in contact with Ms. Maraschiello's skin.

Following the murder, the appellant drove in the stolen Ford toward the exit of the trailer park, encountering Mr. Winston in the Peugeot station wagon at an intersection inside the trailer park. Mr. Winston followed the appellant to Frost Auto Alignment in Clarksville. At Frost Auto Alignment, the appellant parked the stolen Ford and, positioning the incendiary devices inside the vehicle, ignited one of the devices. The appellant then got into Mr. Winston's Peugeot, and the two began to drive toward Nashville. Inside Mr. Winston's vehicle, the appellant changed into clean clothing. Moreover, during their somewhat circuitous trip from Clarksville to Nashville, at various points along Interstate 24, Highway 12, and Highway 49, the appellant threw out of his window various incriminating items, including the clothing that he wore during the murder.

At approximately 11:00 p.m., Mr. Winston and the appellant were traveling toward Nashville on Highway 41-A at an excessive rate of speed, when Trooper Timothy Hale Dover with the Tennessee Highway Patrol conducted a traffic stop of their vehicle. Deputy Randall Anderson with the Cheatham County Sheriff's Department assisted in conducting the stop. The Clarksville Police Department had not yet issued a "BOLO" or "be on the lookout" for the appellant. Accordingly, after checking Mr. Winston's driver's license with the National Crime Information Center ("NCIC") and issuing Mr. Winston a traffic ticket, Trooper Dover allowed both him and the appellant to depart.

After the traffic stop, Mr. Winston and the appellant drove to the Sycamore Creek Bridge on Highway 49. At the bridge, the appellant removed the barrel from the shotgun that he had used to murder Ms. Maraschiello. Next, while Mr. Winston waited in the car, the appellant threw the remaining components into the creek. However, before the appellant could return to the Peugeot, Deputy Anderson, who was en route to his home in Ashland City, approached the bridge, and Mr. Winston began to drive away.

Deputy Anderson stopped his vehicle on the bridge and asked the appellant what he

was doing. The appellant explained that he had asked his friend to stop their vehicle, because he needed to "relieve himself." He added that, while he was outside the vehicle, his friend had jokingly driven away. The appellant asked the deputy to pursue Mr. Winston and instruct him to return to the Sycamore Creek Bridge. As he initiated pursuit, the deputy radioed Trooper Dover and asked that he drive to the bridge and further question the appellant.

Upon arriving at the Sycamore Creek Bridge, Trooper Dover observed the appellant walking alongside the road approximately three hundred feet from the bridge. The trooper stopped his vehicle, requested the appellant's identification, and asked the appellant what he was doing. The appellant gave his driver's license to Trooper Dover and repeated the story that he had told Deputy Anderson. Trooper Dover recalled at trial that the appellant was

> just kind of . . . joking . . . , like his buddy had ran off and left him just to be messing around with him. . . . [H]e wasn't combative or anything and he cooperated totally at that particular point.

Meanwhile, Deputy Anderson had succeeded in detaining Mr. Winston. In contrast to the appellant, Mr. Winston informed the deputy that the appellant was a hitchhiker whom he had picked up in Clarksville and that he had left the appellant on the bridge in order to "get rid of him." Subsequently, Mr. Winston admitted that he had in fact known the appellant for several years. The deputy again radioed Trooper Dover, informed the trooper of his and Mr. Winston's location, and asked that the Trooper transport the appellant to their location.

Upon the arrival of Trooper Dover and the appellant, Deputy Anderson checked the appellant's driver's license with the "NCIC." Again, the Clarksville Police Department had not yet issued a "BOLO" for the appellant. Accordingly, the officers allowed Mr. Winston and the appellant to depart once more. At the appellant's trial, Deputy Anderson recalled that, during this second encounter with Mr. Winston and the appellant, he noticed a .12 gauge shotgun barrel lying in the rear of the Peugeot.

Soon thereafter, the Clarksville Police Department issued a "BOLO" for the appellant on the basis of a preliminary investigation of Ms. Maraschiello's murder. Specifically, Detective Allan Charvis of the Clarksville Police Department had learned that the appellant and Ms. Maraschiello had been engaged in a "heated divorce" involving numerous "altercations" and that Ms. Maraschiello had been "hiding" from the appellant. The detective additionally ascertained that the appellant had recently been accused of sexually abusing his daughter and had been angered by the accusation. Finally, immediately following the issuance of the "BOLO," Trooper Dover and Deputy Anderson notified Detective Charvis that they had encountered the appellant and Mr. Winston in Cheatham County, en route from Clarksville to Nashville, soon after the murder.[6]

---

[6]Later that night, the officers also informed Detective Charvis that they had observed the barrel of a shotgun inside Mr. Winston's Peugeot. It is unclear from the record, however, whether the information concerning the shotgun barrel was conveyed to Detective Charvis prior to the appellant's arrest.

Detective Charvis relayed the above information and details concerning Ms. Maraschiello's murder to Detectives Mason and West of the Nashville Metropolitan Police Department, who additionally discovered that the appellant had previously been employed by their department as a police officer. Detectives Mason and West then proceeded to the appellant's Nashville residence in order to determine whether the appellant was present. Their first visit was unsuccessful. However, they returned to the appellant's residence at approximately 1:00 a.m. At this time, Detective Mason understood, erroneously, that a warrant was currently being issued for the appellant's arrest.

When the detectives approached the appellant's residence a second time, they observed a light inside the house, indicating the possible presence of the appellant. Accordingly, the detectives requested additional assistance. Three uniformed officers quickly arrived at the appellant's residence and positioned themselves strategically around the house. The detectives then approached the appellant's front door and knocked on the door. The appellant eventually responded to the detectives' knock, asking the detectives through the closed door to identify themselves. Detective Mason responded that they were police, and the appellant "need[ed] to open the door and talk to [them]." When the appellant opened the door, Detective Mason ordered the appellant at gunpoint to step onto the porch and lie down on the ground. The appellant complied with the detective's order, and the detective handcuffed the appellant's hands behind his back. Upon inquiry, the appellant indicated that he was alone and refused the detectives permission to search his home for Mr. Winston. Nevertheless, several officers briefly and unsuccessfully searched the appellant's residence for the second suspect.

At the time of the appellant's arrest, the temperature outside was "sub-zero" or "sub-freezing." Accordingly, the officers brought the appellant into his living room and seated him on the couch. Approximately twelve minutes after the appellant's arrest, Detective E.J. Bernard of the Nashville Metropolitan Police Department arrived at the appellant's residence.[7] Detective Bernard advised the appellant that his wife had been killed and also advised the appellant of his Miranda rights. The appellant refused to provide a statement and expressed his desire to consult with an attorney.

Following the appellant's invocation of his Miranda rights, Clarksville Detective Charvis arrived at the residence, accompanied by Sergeant Michael Lee Parr, also an officer with the Clarksville Police Department. The Clarksville officers briefly conferred with the Nashville officers, whereupon Detectives Charvis and Mason left the residence in order to obtain a warrant to search the appellant's house. Detective Bernard and Sergeant Parr also left the residence in order to search for Mr. Winston.

Meanwhile, the appellant, his hands still handcuffed behind his back, remained under guard on the couch in his living room. The heating system inside the house was apparently

---

[7]Detective Bernard apparently knew the appellant, having met him during the appellant's brief tenure with the police department.

malfunctioning, and the temperature inside was approximately forty degrees (40°) Fahrenheit. The appellant was wearing dark blue pants and a t-shirt. At the appellant's request, the police additionally provided the appellant with a button-down shirt. Moreover, the police offered the appellant a blanket, which the appellant initially refused but later accepted. The appellant did not otherwise request additional clothing or ask that he be moved to a warmer location. In fact, during much of his wait, the appellant slept. His dog, a large, black Labrador Retriever, lay on the couch beside him.

At approximately 2:00 a.m. or 2:30 a.m., Trooper Dover arrived at the appellant's residence and identified the appellant as one of two men he had encountered earlier in Cheatham County. At approximately 5:00 a.m., Detectives Charvis and Mason returned to the residence, having successfully obtained a search warrant. At the same time, Detective Bernard and Sergeant Parr also returned, accompanied by Mr. Winston. The officers brought Mr. Winston inside the house, but Mr. Winston quickly indicated that he preferred to wait outside. Accordingly, the officers placed Mr. Winston inside a patrol car. The police, including Detective Bernard, then began to execute the search warrant.

At this time, the appellant asked to speak with Detective Bernard. According to Sergeant Daniel L. Ogren with the Nashville Metropolitan Police Department, the officer primarily responsible for guarding the appellant in the early morning hours of February 17, the appellant's request was entirely unsolicited. Sergeant Ogren immediately notified Detective Bernard of the request.

Detective Bernard approached the appellant and, at the appellant's suggestion, accompanied him to one of the bedrooms. In the bedroom, the appellant asked that the detective re-handcuff him with his hands in front and also requested cigarettes. The detective acceded to these requests and also reiterated that the appellant did not have to speak with the police and that the appellant was entitled to an attorney. The detective then inquired whether the appellant still wished to make a statement. The appellant asserted that he wished to make a statement and then asked, "[W]hat should I do?" When the detective indicated that the appellant should tell the truth, the appellant agreed but asked that he first be allowed to look at his Army uniform, which was hanging on the door of a closet located in the basement. Detective Bernard agreed and proceeded with the appellant to the basement, where the appellant gazed at his uniform for several moments. When the detective inquired whether the appellant had intended to kill himself, the appellant did not respond and merely "held his head down." The appellant additionally looked at a flag belonging to his former Army unit and a picture of his children. Finally, Detective Bernard and the appellant returned to the bedroom.

In the bedroom, the detective again inquired whether the appellant wished to provide a statement. The appellant responded, "Yes, sir, . . . I did it." When the detective requested clarification of the appellant's statement, the appellant responded, "I killed her." The detective then asked the appellant questions concerning his commission of the murder. The detective recalled:

> [E]verytime I would ask him something, [the appellant's] reactions
> were very, very slow. Sometimes when I would ask him a question,

-8-

he would stand there and he was smoking because I was giving him cigarettes and I had no problem in doing that, it was his house. He would look up at me and he would look down and he would continue smoking his cigarette and would look up and it was sometimes as long as ten minutes before I would get an answer, and I do mean ten minutes because I looked at my watch. It was as if he was thinking very, very carefully about what he was saying.

The detective observed that the appellant exhibited no remorse during the interview.

At approximately 6:00 a.m., the police left the appellant's house with both the appellant and Mr. Winston.[8] The appellant informed the police that he had disposed of several incriminating items in Cheatham County. Accordingly, they proceeded to the Cheatham County Sheriff's Department. While waiting for the Sheriff's Department to disperse traffic from areas within the scope of their search, the police provided the appellant with a cup of coffee. The police and the detainees then drove to the Sycamore Creek Bridge on Highway 49 and recovered the murder weapon from the creek. The appellant attempted to recall other locations, where he might have thrown additional items of evidence. However, due to the appellant's unfamiliarity with the area, the ensuing search was largely unsuccessful. Afterwards, the appellant directed the police to Frost Auto Alignment in Clarksville, where he had disposed of the stolen Ford. Finally, the police drove the appellant and Mr. Winston to the Clarksville Police Department, stopping briefly along the way to purchase food for the detainees. At the police department, the appellant provided a written confession, which he signed at approximately 2:00 p.m. The police finally obtained a warrant for the appellant's arrest later on the same day.

On April 3, 1995, the appellant was indicted by a Montgomery County Grand Jury for first degree murder, arson, possession of an explosive weapon, possession of a shotgun with an altered serial number, and theft. Additionally, on September 28, 1995, the State notified the appellant of its intent to seek a punishment of life imprisonment without parole for the offense of first degree murder on the basis of the aggravating circumstance set forth in Tenn. Code Ann. § 39-13-204(i)(3) (1994), that "[t]he defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder." The appellant's case proceeded to trial on March 17, 1997, concluding on March 21, 1997.

At trial, the State relied heavily upon the appellant's statements to the police following the murder. The appellant testified on his own behalf, again confessing that he killed his wife. In defense, however, the appellant adduced testimony in support of the proposition that, prior to the shooting and at the time of the shooting, he did not possess the capacity to form the requisite mental state for first degree murder.

Specifically, the appellant presented testimony by Kevin Wilkinson, a pastor of the First Christian Church in Hendersonville, Tennessee, and a captain in the Tennessee Army National

---

[8]The appellant and Mr. Winston traveled in separate police vehicles.

Guard. According to Mr. Wilkinson, he is also a dilettante or an amateur in the field of psychology. Mr. Wilkinson testified that, at the request of the appellant's parents, he visited the appellant in the Montgomery County Jail on March 2, 1995, and spoke with the appellant for approximately two hours. Mr. Wilkinson recalled that, during their interview, the appellant's speech was "flighty," i.e., the appellant "frequently departed from the stream of thought." Additionally, the appellant appeared to possess a "very, very tenuous, a very fragile connection with reality." Mr. Wilkinson concluded that the appellant was experiencing the "residual effects of a psychotic episode." Moreover, Mr. Wilkinson opined that the appellant was suffering "post battle phase." Mr. Wilkinson described "post battle phase" as

> the time after battle has occurred when troops are given time to intentionally reconstitute mentally, emotionally, physically, psychically and to stabilize. . . . The symptomologies of people who are not properly reconstituting . . . would be erratic behavior, manic types of behavior, blood thirstiness, a desire to get back out on the line. Sometimes it is indicated by fighting, sometimes it is indicated by people who are simply withdrawn, what they called in World War I, shell-shock, battle fatigue is what the term is now.

The appellant also presented the testimony of Dr. Pamela Auble, a clinical psychologist. Dr. Auble examined the appellant on February 6, 1996, and on September 18, 1996, and reviewed various records pertaining to the appellant, including records from the Middle Tennessee Mental Health Institute, the Harriet Cohn Mental Health Center, the Veterans Administration, the Army, the Nashville Metropolitan Police Department, and the Louisville, Kentucky Police Department. According to Dr. Auble, the appellant was suffering from a delusional disorder, post-traumatic stress disorder, and depression. She also noted "elements of a paranoid personality structure." She concluded that, due to the appellant's delusional disorder, his

> intent to commit . . . [the murder of his wife] was really on a false data base. He - - what he believed and what was true were two different things. So that Mr. Maraschiello was like living in a nightmare. He thought that he could see how evil this other person was and nobody else could see it. He acted as if - - he believes that his beliefs were true. His beliefs were that his wife was someone who was abusing and neglecting their children, sexually, physically, and emotionally and that she was in essence, a prostitute. So his actions were based on his belief that all that was true. As part of his delusional disorder.

Dr. Auble conceded, however, that the appellant was not insane at the time of the instant offenses. Moreover, Dr. Auble testified that, at the time of her interview with the appellant, he was competent to stand trial.

Dr. William D. Kenner, a psychiatrist, also testified on behalf of the appellant. Dr. Kenner testified that he interviewed the appellant on February 17 and 25, 1996, and reviewed numerous records concerning the appellant, including Dr. Auble's report. He concurred in Dr. Auble's conclusion that the appellant was suffering a delusional disorder. Specifically, he opined

-10-

that the appellant was suffering from "conjugal delusions" or an "Othello syndrome."  The doctor explained:

...Shakespeare's play, Othello, in which he has this fellow named Diago, who is a rotten apple in the bunch and Diago is telling Othello all these bad things about his wife and Othello believes him and ends up killing his wife. In delusional disorder, the Diago is a part of the individual himself.

Dr. Kenner further described the appellant's delusions and their impact upon his capacity to form the requisite mental state for first degree murder:

> [The appellant believed] that his wife was out to kill him, that she was trying to abuse his children, sexually abusing his children.  That she was the devil herself.  She was - - all involved in pornography in terms of being photographed or something along those lines and that she was involved in various affairs.
>
> * * *
>
> [On February 16, 1995,] . . . what happened was a sort of tragic convergence if you will of his mental illness on the one hand and on the other hand, the fact that he and his wife were having problems probably in a large part as a result of his mental illness because someone who develops this disorder is no fun to be with.  I mean, they are - - they are picky.  They go for very small details, they are accusatory.  They have this tremendous amount of anger focused on the other person and so it is really burdensome to have a relationship with someone like this, so I would imagine that she was trying to get away from him and his disordered way of thinking and interacting with her so that she was trying to leave him at a time when he was looking for evidence to prove his case that she was evil, that she was killing, damaging him in that he actually committed this crime, not with the ability to think logically about it.  Even though so many of the actions may have looked logical.  The thinking process that was the foundation for that action was severely distorted.
>
> * * *
>
> [I]t impacted on his ability to form intent in that his basis for his action was defective and he was operating not with a full deck.  It was like he was playing poker and there were some jokers in the deck and he was dealing with those jokers as if they were real face cards or something.  As though his wife was definitely out to kill him and she was sexually abusing the children and all these horrible things.

Finally, noting the incidence of mental illness in the appellant's family, Dr. Kenner opined that the appellant likely possessed a genetic predisposition to develop a delusional disorder. Moreover, Dr. Kenner observed that a delusional disorder is "more likely to occur in people who have gone through some kind of stressor" and opined that the appellant's military service in the Persian Gulf War could have triggered his disorder.

In rebuttal, the State presented the testimony of Dr. Sam Craddock, a psychologist employed by the Forensic Services Division of the Middle Tennessee Mental Health Institute.

According to Dr. Craddock, the appellant was admitted to the institute at the beginning of July 1995 and was evaluated by the institute for approximately one month. On the basis of this evaluation and on the basis of a social history compiled by Rebecca Smith,[9] a psychiatric social worker employed by the Forensic Services Division, Dr. Craddock diagnosed the appellant with a narcissistic personality disorder. He conceded that psychological testing did not support his diagnosis but further noted that the appellant's responses to testing were inconsistent with his observations of the appellant during the appellant's stay at the institute. Dr. Craddock also opined that the appellant was not insane at the time of the instant offenses, was competent to stand trial, and did not qualify for commitment to a psychiatric hospital. He concluded that, at the time of the murder, the appellant was capable of forming the requisite mental state for first degree murder. Rokeya Farooque, a psychiatrist employed by the Forensic Services Division, concurred in Dr. Craddock's opinion. Moreover, she rejected Dr. Auble's and Dr. Kenner's diagnoses of a delusional disorder. She explained that interviews with the appellant's friends and family had revealed that the appellant's beliefs concerning his wife, as described by the appellant to the doctor, were based in reality.

At the conclusion of the trial, the jury convicted the appellant of the offenses charged in the indictment.[10] Immediately following the jury's verdicts of guilt, the trial court conducted a separate sentencing hearing in accordance with Tenn. Code Ann. § 39-13-204. At the conclusion of the hearing, the jury imposed a sentence of life imprisonment for the offense of first degree murder. Moreover, following a sentencing hearing on May 13, 1997, the trial court imposed a sentence of two years incarceration in the Department for the offense of arson, two years incarceration in the Department for the offense of possession of an explosive weapon, six months incarceration in the Montgomery County Workhouse for the offense of possession of a shotgun with an altered serial number, and six months incarceration in the workhouse for the offense of theft. The trial court ordered consecutive service of the appellant's sentences.

## II. Analysis

### a.    The Appellant's Confession

On appeal, the appellant first challenges the trial court's denial of his motion to suppress the State's use at trial of his confession to the police. Specifically, the appellant challenges the voluntariness of his confession and, in any event, contends that his confession was the fruit of his unlawful arrest. The State, in turn, concedes that the appellant's arrest violated the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the Tennessee Constitution. However, the State asserts that the appellant voluntarily confessed to the murder of his wife and that the connection between the unlawful arrest and the appellant's confession was

---

[9]Ms. Smith conceded at trial that, in compiling the appellant's social history, she was not able to review the appellant's Army records.

[10]A minor exception relates to the appellant's theft of the Ford vehicle. Although the indictment originally charged the appellant with theft of property worth more than one thousand dollars ($1,000), the jury convicted the appellant of theft of property worth less than five hundred dollars ($500).

-12-

sufficiently attenuated to dissipate the primary taint of the unlawful invasion. Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 416 (1963).

The trial court conducted a suppression hearing on March 14 and 15, 1996. Following the hearing, the trial court concluded that the police had unlawfully arrested the appellant. However, the court further noted that,

> even though the arrest was illegal at that point, the statement made by the defendant need not be suppressed if it is voluntary, under the Fifth Amendment and there were sufficient intervening circumstances to break the causal connection between the illegal arrest and a confession, so that the confession is on its own sufficiently an act of free will and thus, because it is an act of free will on its own, it purges the taint created by the initial illegal arrest.
>
> * * *
>
> In other words, is the violation of the Fourth Amendment and the illegal arrest resulting therefrom, so egregious that it affects the otherwise voluntary statement under the Fifth Amendment given by the Defendant.

The court concluded that the appellant's confession was, indeed, voluntary and that the confession's connection with the unlawful arrest was sufficiently attenuated.

Preliminarily, we note that the appellant made more than one incriminating statement to the police. The appellant's argument on appeal focuses exclusively upon the circumstances of his initial statement to Detective Bernard at the appellant's residence. Our discussion will similarly focus upon the appellant's initial statement. On the one hand, if the initial statement was involuntary or the fruit of an unlawful arrest, the ensuing statements were likely the result and the fruit of the first. "[H]aving 'let the cat out of the bag' does not automatically vitiate [the voluntariness]" of a subsequent confession nor, under the "fruit of the poisonous tree" doctrine, preclude the admission of the subsequent confession. State v. Crump, 834 S.W.2d 265, 271-272 (Tenn. 1992)(citing State v. Smith, 834 S.W.2d 915, 919 (Tenn. 1992)). However, the provision of one incriminating statement does bolster the pressures to provide a second or "at least vitiate any incentive . . . to avoid self-incrimination." Brown v. Illinois, 422 U.S. 590, 605 n.12, 95 S.Ct. 2254, 2262 n.12 (1975). See Crump, 834 S.W.2d at 272 (under the Tennessee Constitution, there is a rebuttable presumption that an illegally obtained confession will taint any subsequent confession). On the other hand, if the initial statement was admissible at the appellant's trial, the appellant does not argue that the subsequent statements were otherwise inadmissible. Moreover, if the initial statement was admissible, any error by the trial court in admitting the ensuing statements was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828 (1967). See also Arizona v. Fulminante, 499 U.S. 279, 310-312, 111 S.Ct. 1246, 1265-1266 (1991).

With respect to the appellant's initial statement, a determination of whether a confession satisfies the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution logically precedes any attenuation analysis under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 7

of the Tennessee Constitution. Obviously, if a confession is inadmissible pursuant to the former constitutional provisions, a court need not determine whether the confession is additionally the fruit of some other illegality.

The Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution protect an accused's right against compelled self-incrimination. State v. Blackstock, No. E1994-00004-SCR-11-CD, 2000 WL 358624, at *6 (Tenn. at Knoxville, April 10, 2000)(citing State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994)). Moreover, in Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966), the United States Supreme Court held that the Fifth and Fourteenth Amendments' proscription against compelled self-incrimination requires that any interrogation of a suspect in custody be preceded by advice that he has the right to remain silent, that any statement that he makes may be used against him in court, and that he has the right to consult with an attorney, whether retained or appointed, and have the attorney present during any questioning. In other words, a constitutional waiver of the right against compelled self-incrimination requires the accused to make a knowing, intelligent, and voluntary waiver of the rights afforded by Miranda. State v. Ashworth, 3 S.W.3d 25, 31 (Tenn.Crim.App. 1999).

At a suppression hearing, the State has the burden of proving a valid waiver of Miranda rights by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn.1997). In other words, the State must establish that a defendant's waiver of Miranda rights was

> voluntary in the sense that it . . . [was] the product of a free and deliberate choice rather than the product of intimidation, coercion or deception. Moreover, the waiver must . . . [have been] made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Stephenson, 878 S.W.2d at 544. See also Blackstock, No. E1994-00004-SCR-11-CD, 2000 WL 358624, at *6. Courts look to the totality of the circumstances when determining whether an accused has made a knowing, intelligent, and voluntary waiver. State v. Callahan, 979 S.W.2d 577, 581-582 (Tenn. 1998). On appeal, the determination by a trial court that a defendant executed a valid waiver is binding upon this court unless the appellant can demonstrate that the evidence preponderates otherwise. State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999); State v. Odom, 928 S.W.2d 18, 22-23 (Tenn. 1996). See also Blackstock, No. E1994-00004-SCR-11-CD, 2000 WL 358624, at *8.

If an accused declines to waive the rights afforded by Miranda and "expresse[s] his desire to deal with the police only through counsel, [he may not be] . . . subject[ed] to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with police." Edwards v. Arizona, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884-1885 (1981). See also Stephenson, 878 S.W.2d at 545. "Interrogation" encompasses any "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect . . . ." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690 (1980). A trial court's determination of whether an accused was subjected to police interrogation involves questions of both fact and law and is reviewed de novo by the appellate

courts.  See, e.g., State v. Land, No. M1999-01023-CCA-R3-CD, 2000 WL 678787, at *4 (Tenn. Crim. App. at Nashville, April 28, 2000).

In the absence of interrogation, the Fifth and Fourteenth Amendments do not prohibit police from "merely listening to a defendant's voluntary, volunteered statements and using them against him at trial."  Edwards, 451 U.S. at 485, 101 S.Ct. at 1885.  This is true even when the statement is volunteered by an accused who is in custody and has previously asserted his right to remain silent or his right to counsel.  2 WAYNE R. LAFAVE, ET AL., CRIMINAL PROCEDURE § 6.7(d), at 566 (West Group ed., 2d ed. 1999).  Of course,

> [i]f, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation."  In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

Edwards, 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n.9.  See also Oregon v. Bradshaw, 462 U.S. 1039, 1044-1045, 103 S.Ct. 2830, 2834 (1983)(plurality opinion).

As previously noted, the appellant in this case was advised concerning his Miranda rights approximately twelve minutes following his arrest and immediately invoked his rights, declining to provide a statement to the police and requesting an attorney.  Four hours later, the appellant asked to speak with Detective Bernard and confessed to the murder of his wife.  Significantly, the appellant does not explicitly argue in his brief that he was subjected to "interrogation" during the interval between his invocation of Miranda rights and his request to speak with Detective Bernard, nor do we believe that the record reflects any activity by the police during this interval that the police should have known was likely to evoke an incriminating response from the appellant.  Innis, 446 U.S. at 301, 100 S.Ct. at 1690.

Thus, we reject any implication in the appellant's brief that the police placed the appellant in uncomfortable circumstances in order to elicit a confession or should otherwise have anticipated a confession due to the circumstances of the appellant's detention.  Again, following his arrest and invocation of his Miranda rights and prior to his request to speak with Detective Bernard, the appellant was detained in his home for approximately four hours while the police procured a warrant to search his home and sought the appellant's accomplice.  During this four-hour interval, the appellant slept on a couch in his living room.  Although the temperature in the house was approximately forty degrees Fahrenheit (40°), the appellant never asked that he be moved to a different location.  Sergeant Ogren testified that he would have moved the appellant to a warmer location had the appellant indicated any discomfort.  The appellant did request and was provided a button down shirt.  Moreover, the police offered and the appellant ultimately accepted a blanket. The police also permitted the appellant's Labrador Retriever to lie on the couch with the appellant. We do note that the appellant's hands were handcuffed behind his back during his lengthy sojourn

on his couch, but apparently the handcuffs did not cause the appellant sufficient discomfort to prevent him from sleeping. Indeed, the appellant did not request that the police change the position of his hands until immediately prior to his confession.

The record does reflect that, during the four-hour interval, Trooper Dover identified the appellant. Moreover, during the interval, the police apprehended the appellant's accomplice, Mr. Winston, and brought Mr. Winston to the appellant's home. The disclosure of incriminating evidence to a suspect, however, does not necessarily constitute interrogation within the meaning of Innis. See, e.g., Shedelbower v. Estelle, 885 F.2d 570, 573 (9th Cir. 1989)(police officer's comments to a rape and murder suspect that his accomplice was in custody and that the surviving victim had identified his photograph did not constitute interrogation); United States v. Vazquez, 857 F.2d 857, 938 (1st Cir. 1988)("the disclosure of the fact that a suspected accomplice has been questioned is [not] of sufficient moment to implicate Innis' standard of 'acts reasonably likely to elicit an incriminating response'"). Compare Nelson v. Fulcomer, 911 F.2d 928, 935 (3rd Cir. 1990)(confronting a suspect with his or her alleged partner in crime and claiming that the partner has confessed constitute "interrogation"). Moreover, while not determinative, there is no indication in the record that the police engaged in these activities in anticipation of any response by the appellant. Rather, the record reflects that the police were "engaged in activity calculated to produce evidence against the defendant by other means . . . ." 2 LAFAVE, supra § 6.7(c), at 562. We conclude that the police did not subject the appellant to interrogation during the four-hour interval between his invocation of Miranda rights and his request to speak with Detective Bernard.

Indeed, the record is devoid of any evidence of coercive activity by the police prior to the appellant's confession. Absent coercive police activity, we must conclude that the appellant voluntarily initiated a dialogue with Detective Bernard and confessed to the murder of his wife. State v. Brimmer, 876 S.W.2d 75, 79 (Tenn. 1994); State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980). See also State v. Phillips, No. E1999-01104-CCA-R3-CD, 2000 WL 336960, at *5 (Tenn. Crim. App. at Knoxville, March 31, 2000).[11] Moreover, even assuming that Detective Bernard, following the appellant's initiation of a dialogue, engaged in interrogation, the totality of circumstances reflect the appellant's knowing and intelligent waiver of his Miranda rights. The appellant in this case possesses a college education and is a former captain in the United States Army. Moreover, at the time of his arrest, the appellant had recently undergone training as a police officer. Finally, as noted previously, the appellant was advised of his Miranda rights soon after his arrest and was again advised of his right to remain silent and his right to counsel immediately

---

[11] The appellant indicates in his brief that, prior to his arrest, he had been preparing to commit suicide. Thus, the appellant hints that his mental condition rendered him more susceptible to police coercion. Again, the record simply does not reflect any coercive police activity. Moreover, other than Detective Bernard's purely speculative testimony, the record does not indicate that the appellant was suicidal. The appellant's elaborate efforts to conceal his commission of the murder and the absence of any weapons in his home suggest a contrary conclusion. Finally, testimony at trial indicated that, to the extent the appellant was suffering from a mental disorder, the disorder rendered him inflexible and resistant to any form of authority.

following his request to speak with Detective Bernard.[12]

In sum, the admission into evidence of the appellant's initial confession was consistent with the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. We turn, then, to the question of whether the appellant's confession was the fruit of his unlawful arrest.

In Wong Sun, 371 U.S. at 488, 83 S.Ct. at 417 (citation omitted), the Supreme Court noted that, in determining whether a confession is the fruit of a prior illegality, the "apt question . . . is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Stated in another way, a court must determine whether the confession was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." Id. at 486, 416-417. At a suppression hearing, the State carries the burden of establishing sufficient attenuation. Brown, 422 U.S. at 604, 95 S.Ct. at 2262; State v. Carter, 16 S.W.3d 762, 766 (Tenn. 2000); State v. Huddleston, 924 S.W.2d 666, 675 (Tenn. 1996).

In Brown, 422 U.S. at 603-604, 95 S.Ct. at 2261-2262, the Supreme Court listed several factors pertinent to a trial court's determination of whether the connection between an unlawful arrest and a confession is sufficiently attenuated, including (1) the provision of Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of official misconduct. See also Carter, 16 S.W.3d at 766; Huddleston, 924 S.W.2d at 674-675; State v. Burtis, 664 S.W.2d 305, 308-309 (Tenn. Crim. App. 1983). The Supreme Court emphasized that "[n]o single fact is dispositive . . . ." Brown, 422 U.S. at 603, 95 S.Ct. at 2261. On appeal, this court reviews de novo the trial court's determination. State v. Ford, No. M1999-01078-CCA-R3-CD, 2000 WL 502825, at *2 (Tenn. Crim. App. at Nashville, April 27, 2000).

It is undisputed in this case that the appellant was advised of his Miranda rights following his arrest and was again advised of his right to remain silent and his right to counsel immediately prior to his confession. Of course, "Miranda warnings, alone and per se, cannot always

---

[12]Interestingly, the appellant does not appear to argue in his brief that any mental ailment impaired his ability to comprehend his Miranda rights and the consequences of his decision to waive those rights. Moreover, we note that, although the record contains some evidence that the appellant was suffering from a delusional disorder at the time of his arrest, Dr. Kenner's testimony indicates that the disorder would not have precluded the appellant's knowing and intelligent waiver of his Miranda rights. Specifically, Dr. Kenner testified that a delusional disorder only impairs a person's "thinking within that particular area . . . that has to do with their delusion." In this case, to the extent that the appellant was suffering a delusional disorder, his delusions related solely to his wife's behavior during their marriage. Indeed, the psychologists and psychiatrists who examined the appellant unanimously observed that, notwithstanding any mental disease or defect, the appellant was competent to stand trial.

make the . . . [confession] sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." Brown, 422 U.S. at 603, 95 S.Ct. at 2261. Nevertheless, this factor weighs against suppression.

As to the temporal proximity of the arrest to the appellant's confession, one noted authority has observed that "temporal proximity is the 'least determinative factor involved' in the Brown formula." 3 LAFAVE, supra § 9.4(a), at 361 (footnote omitted). In any event, the four-hour interval in this case between the arrest and the confession was insufficient to purge the confession of the primary taint. See, e.g., Taylor v. Alabama, 457 U.S. 687, 690, 102 S.Ct. 2664, 2667 (1982)(an interval of six hours between an unlawful arrest and a confession will not purge the primary taint). Accordingly, this factor weighs in favor of suppression.

As to the presence of intervening circumstances, a spontaneous, volunteered statement can itself be a significant intervening circumstance. See, e.g., United States v. Houle, 620 F.2d 164, 166 (8th Cir. 1980); United States v. McQuagge, 787 F.Supp. 637, 663 (E.D. Texas 1992); State v. Gonzales, 731 P.2d 1101, 1108 (Wash. App. 1986). In other words,

> [w]hen a suspect volunteers a statement absent the pressures of interrogation, . . . it is far . . . [from] clear that the law enforcement officers have actively exploited the illegal arrest. In such a case, 'the illegal arrest merely provides the occasion of initial contact between the police and the accused,' and the deterrent effect of excluding such a statement is doubtful.

McQuagge, 787 F.Supp. at 663 (citation omitted). We have already concluded that the appellant was not subjected to interrogation prior to his initiation of a dialogue with Detective Bernard. We likewise conclude that the appellant's statement to the detective that, "I killed her," was not the product of interrogation and, therefore, was not "'come at by exploitation of th[e] [primary] illegality.'" Wong Sun, 371 U.S. at 488, 83 S.Ct. at 417 (citation omitted).[13]

Finally, the police conduct in arresting the appellant was neither purposeful nor flagrant. In this regard, we note that it was at least arguable that the police possessed probable cause to believe that the appellant had murdered his wife, and, indeed, the record reflects Detective Mason's belief that an arrest warrant was currently being issued.[14] In other words, the appellant's

---

[13]In reaching this conclusion, we note that "a question which would clarify a prior ambiguous statement (e.g., 'did what?' in response to 'I did it')" does not constitute interrogation. 2 LAFAVE, supra § 6.7(d), at 567. Moreover, under the circumstances of this case, Detective Bernard's indication to the appellant that, if he intended to make a statement, he should tell the truth did not constitute interrogation. See, e.g., State v. Clark, 377 S.E.2d 54, 60 (N.C. 1989)("[e]ncouraging a defendant to tell the truth, even after she has asked for a lawyer, does not constitute interrogation nor its 'functional equivalent'").

[14]Detective Mason correctly noted that he was not required to have the warrant in his possession at the time of the arrest. Tenn. R. Crim. P. 4(d)(3).

illegal arrest was more the result of miscommunication between the Clarksville Police Department and the Nashville Police Department than the result of any "purposeful" misconduct. That having been said, at the time of his arrest, the proof implicating the appellant in his wife's murder was purely circumstantial. Thus, while the police in this case did not merely arrest the appellant "in the hope that something would turn up," Taylor, 457 U.S. at 693, 102 S.Ct. at 2668, the appellant's arrest was clearly one component of a continuing investigation, Carter, 16 S.W.3d at 768. Nevertheless, having considered all of the above factors, we conclude that the appellant's confession was not the fruit of his arrest and was admissible at his trial. This issue is without merit.

### b.      Testimony of Timothy Winston

Citing State v. Dicks, 615 S.W.2d 126 (Tenn. 1981), the appellant next contends that the trial court committed reversible error in permitting the State to call the appellant's accomplice, Timothy Winston, to the witness stand in light of Mr. Winston's stated intention to invoke his privilege against self-incrimination. The State responds, in essence, that the appellant has failed to demonstrate prejudice.

During the appellant's trial, the State announced that it intended to call Mr. Winston to the witness stand. Defense counsel immediately objected, stating that Mr. Winston had informed her that he intended to invoke his privilege against self-incrimination. The prosecutor responded that he was unaware of any authority prohibiting him from calling Mr. Winston to the witness stand regardless of Mr. Winston's intention. The prosecutor also noted that Mr. Winston had not indicated to him that he intended to invoke the privilege.

Due to defense counsel's objection, the trial court permitted the prosecutor to question Mr. Winston outside the jury's presence in order to determine his intention, whereupon Mr. Winston confirmed that he intended to invoke his privilege against self-incrimination. Nevertheless, the trial court permitted the State to examine Mr. Winston in the jury's presence. The following colloquy ensued:

| | |
|---|---|
| Prosecutor: | Please state your full name, sir. |
| Mr. Winston: | Timothy Glenn Winston. |
| Prosecutor: | Mr. Winston, where do you live? |
| Mr. Winston: | 3104 River Drive. |
| Prosecutor: | Is that in Nashville? |
| Mr. Winston: | Yes. |
| Prosecutor: | Where are you currently employed? |
| Mr. Winston: | I am supposed to start work Monday at United Stationary. |
| Prosecutor: | Is that in Nashville too? |
| Mr. Winston: | Yes. |
| Prosecutor: | To my left, I think is seated, Michael Maraschiello, wearing a gray suit; do you know Mr. Maraschiello? |
| Mr. Winston: | Yes. |
| Prosecutor: | How long have you known Mr. |

| | Maraschiello? |
|---|---|
| Mr. Winston: | Based on counsel, I am going to take the Fifth. |
| The Court: | Mr. Winston, on advice of your attorney, you are asserting your Fifth Amendment privilege against self-incrimination, is that correct? |
| Mr. Winston: | Once again, Your Honor, based on information that I was given from both sides, and the information then conflicting, yes. |
| The Court: | And you wish to assert that privilege with regard to any questions . . . that either attorney might ask pertaining to this case, is that correct, sir? |
| Mr. Winston: | That's correct. |

At the time of his testimony, Mr. Winston was wearing "orange jailhouse clothes with Montgomery County Jail on the back of his shirt and on the sides of his pants."

In Dicks, 615 S.W.2d at 129, our supreme court noted the general principle that neither a defendant nor the prosecution possesses the right to benefit from any inferences a jury may draw from a witness' assertion of his privilege against self-incrimination. Dicks, 615 S.W.2d at 129 (citing United States v. Johnson, 488 F.2d 1206, 1211 (1st Cir. 1973)); State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Consistent with this general principle, the prosecution "'may not deliberately call a witness closely identified with the defendant, knowing that the witness will assert his right to remain silent.'" Busby v. Holt, 781 F.2d 1475, 1477 (11th Cir. 1986). The United States Court of Appeals for the District of Columbia explained that, while a jury may believe that a witness' invocation of the privilege is of probative significance,

> the probative value of the event is almost entirely undercut by the absence of any requirement that the witness justify his fear of incrimination and by the fact that it is a form of evidence not subject to cross-examination.

Bowles v. United States, 439 F.2d 536, 541-542 (D.C. Cir. 1970).

Nevertheless, in Namet v. United States, 373 U.S. 179, 186-187, 83 S.Ct. 1151, 1154-1155 (1963), the United States Supreme Court observed that "[n]one of the several decisions dealing with this question suggests that reversible error is invariably committed whenever a witness claims his privilege . . . [in the jury's presence]." Rather, the Supreme Court noted that lower courts consider several factors. Id. First, courts consider the presence of prosecutorial misconduct, i.e., whether the prosecutor made a conscious and flagrant attempt to build his case out of inferences arising from invocation of the privilege. Id. Second, courts consider whether the witness' refusal to answer "added critical weight to the prosecutor's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." Id. See also Douglas v. State of Alabama, 380 U.S. 415, 418-420, 85 S.Ct. 1074, 1076-1077 (1965)(under the latter circumstances, the witness' refusal

-20-

to answer will violate the Confrontation Clause of the Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment).

The two factors articulated above have subsequently been referred to as the "Namet test." See, e.g., United States v. Victor, 973 F.2d 975, 979 (1st Cir. 1992). In applying this "test," courts more specifically consider (1) the prosecutor's intent in calling the witness; (2) the number of questions which elicit an assertion of the privilege; (3) whether either side attempted to draw adverse inferences, in closing argument or at any time during trial, from the witness' refusal to testify; (4) whether the inferences relate to central issues or collateral matters; (5) whether the inferences constitute the only evidence bearing upon the issue or are cumulative of other evidence; and (6) whether the trial court provided curative instructions. Id.; United States v. Crozier, 987 F.2d 893, 901 (2nd Cir. 1993).

Having considered the above guidelines, we conclude that the trial court erred in permitting Mr. Winston to testify before the jury, but the error does not mandate reversal of the appellant's convictions. In reaching this conclusion, we acknowledge that, with the possible exception of establishing Mr. Winston's acquaintance with the appellant, the prosecution's motive in calling Mr. Winston to the witness stand was clearly the creation of an impermissible inference that Mr. Winston's testimony would be unfavorable to the appellant and would further establish the appellant's guilt of the charged offenses. This inference was underscored by Mr. Winston's appearance before the jury in a jail uniform. However, the inference was cumulative of other, overwhelming evidence of the appellant's guilt, including the appellant's own statements to the police and his testimony at trial. Moreover, the prosecutor in this case only asked a few, purely preliminary questions prior to Mr. Winston's invocation of his privilege against self-incrimination. Finally, during the trial, including closing argument, the prosecutor otherwise refrained from mentioning to the jury Mr. Winston's invocation of the privilege. This issue is without merit.

## c.    Gulf War Syndrome

The appellant next contends that the trial court erred in excluding testimony concerning "Gulf War Syndrome," thereby "significantly impair[ing] the jury's ability to accurately assess his mental state and . . . [his] ability to form the intent necessary to commit first degree murder." The State responds that the disputed testimony was neither relevant nor admissible pursuant to evidentiary rules governing the admission of expert testimony.

During his trial, the appellant proffered the testimony of Joyce Riley, a nurse, "medical legal consultant," and the Spokesperson for the American Gulf War Veteran's Association. The trial court conducted a hearing outside the presence of the jury, wherein Ms. Riley informed the court that she had previously testified as an expert on Gulf War Syndrome and had also testified concerning chemical and biological warfare before President Clinton's Presidential Advisory Commission. With respect to the instant case, she stated that she could not testify that the appellant was suffering from Gulf War Syndrome but could testify generally concerning problems suffered by veterans who had fought in the Persian Gulf War. Specifically, Ms. Riley stated that she had interviewed "hundreds" of veterans of the Persian Gulf War and had examined reports issued by the United States Senate and other evidence obtained from the federal government, including some

documents pertaining to "scientifically controlled medical stud[ies]," which were the subject of "peer review." On the basis of the interviews and the government documents, she asserted:

> [W]e are seeing chronic fatigue, muscle pain, joint pain, night sweats, chest pain, headaches, extreme emotional ability - - they are not at all having the same thought processes that they did prior to the Gulf War. Many of them are divorcing, marital problems, and primarily we are concerned - - I am concerned about the violent outbursts in Gulf War Veterans since the Gulf War.

She noted that more than fifty percent (50%) of the veterans that she had interviewed and veterans whose complaints of "concentration loss and memory loss and problems in thinking processes" are recorded in government documents "have problems with emotional outbursts, violent behavior and violent actions, that they are committing, that they never did prior to the Gulf War."

At the conclusion of the hearing, the trial court declined to admit Ms. Riley's testimony pursuant to Tenn. R. Evid. 702, because Ms. Riley was unable "to relate her expertise to the facts of this case." The trial court additionally found that Ms. Riley's testimony relied primarily upon hearsay statements by veterans allegedly suffering from Gulf War Syndrome and was, therefore, inadmissible under Tenn. R. Evid. 703.

Expert testimony regarding a defendant's capacity or lack of capacity to form the mental state required for the commission of an offense is admissible if it satisfies "general relevancy standards as well as . . . evidentiary rules which specifically govern expert testimony." State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). In this regard, Tenn. R. Evid. 401 broadly provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Even relevant evidence may be excluded, however, if its probative value is "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403. Moreover, Tenn. R. Evid. 702 (emphasis added) requires that expert testimony "*substantially* assist the trier of fact to understand the evidence or to determine a fact in issue . . . ," and the facts or data underlying the expert's opinion must be "trustworthy," Tenn. R. Evid. 703. A trial court's application of these rules to exclude expert testimony will not be reversed on appeal absent an abuse of discretion. State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999).

We conclude that the trial court acted well within its discretion in excluding Ms. Riley's testimony. Despite her avowed expertise, Ms. Riley apparently did not interview the appellant and did not propose to testify that symptoms described by the appellant were consistent overall with "categorized" symptoms of Gulf War Syndrome. In order to be admissible, an expert's testimony must relate to the particular defendant on trial. See Meeks v. State, No. 01C01-9807-CC-00295, 1999 WL 173972, at *4 (Tenn. Crim. App. at Nashville, March 30, 1999)(interpreting Hall, 958 S.W.2d at 691). Moreover, Ms. Riley did not indicate that, if the appellant were suffering from Gulf War Syndrome, the syndrome would preclude his formation of the requisite mental state. Our supreme court emphasized in Hall, 958 S.W.2d at 690, that "[i]t is the showing of a lack of *capacity* to form the requisite culpable mental intent [due to a mental disease or defect] that is central to evaluating the admissibility of expert psychiatric testimony on the issue." (Emphasis in original).

Accordingly, Ms. Riley's testimony was, indeed, irrelevant, raised a significant danger of confusion of the issues or misleading the jury, and did not satisfy the standard for admissibility of expert testimony set forth in Tenn. R. Evid. 702.[15] This issue is without merit.

**d.     Consecutive Sentencing**

Finally, the appellant argues that the trial court erred in imposing consecutive sentencing. The State once again disagrees with the appellant. This court's review of the manner of service of a sentence is de novo. Tenn. Code. Ann. § 40-35-401(d) (1997). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code. Ann. § 40-35-102, -103 (1997), -210 (1994). See also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is upon the appellant to demonstrate the impropriety of his sentence. Tenn. Code. Ann. § 40-35-401, Sentencing Commission Comments. See also State v. Wilkerson, 905 S.W.2d 933, 934 (Tenn. 1995). Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determination a presumption of correctness. Tenn. Code. Ann. § 40-35-401(d); Ashby, 823 S.W.2d at 169.

Tenn. Code Ann. § 40-35-115(a) (1997) provides that a trial court may impose consecutive sentencing upon the determination that a defendant meets one of the criteria listed therein. Moreover, if the trial court classifies a defendant as a dangerous offender pursuant to Tenn. Code Ann. § 40-35-115(b)(4), the court must also find that the defendant's sentence reasonably relates to the severity of his offenses and is necessary in order to protect the public from further criminal conduct by the defendant. Wilkerson 905 S.W.2d at 938. See also State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999).

In this case, the trial court found that the appellant is a dangerous offender. Tenn. Code Ann. § 40-35-115(b)(4). However, the trial court failed to make the additional findings required by Wilkerson, and its determination will not be accorded a presumption of correctness. Nevertheless, pursuant to our de novo review, we conclude that the trial court properly imposed consecutive sentencing.

First, we agree with the trial court that the circumstances of this offense amply demonstrate that the defendant has little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(4). Indeed, the record reflects that, in murdering his wife, the appellant shot repeatedly through the front door and walls of his wife's trailer notwithstanding his certain knowledge of the possibility that his

_____

[15]Accordingly, we need not address whether the facts or data underlying Ms. Riley's testimony "indicate lack of trustworthiness" under Tenn. R. Evid. 703.

two daughters were inside.  Second, the aggregate length of the appellant's sentences is without question commensurate with the gravity of his offenses.  Finally, although we have noted the need for caution when relying totally upon the circumstances of the offenses in applying the public protection requirement of <u>Wilkerson</u>, we conclude that the requirement has been satisfied in this case.  <u>State v. Shipp</u>, No. 03C01-9907-CR-00312, 2000 WL 290964, at **2-4 (Tenn. Crim. App. at Knoxville, March 21, 2000).  This issue is without merit.

### III.  Conclusion
For the foregoing reasons, we affirm the judgment of the trial court.

_____
Norma McGee Ogle, Judge