IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 13, 2020 Session

## MICHAEL F. MARASCHIELLO v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 35643     Jill Bartee Ayers, Judge**

_____

**No. M2019-01287-CCA-R3-PC**

_____

Petitioner, Michael F. Maraschiello, was convicted of first degree murder, arson, possession of a shotgun with an altered serial number, and theft after a jury trial in 1997. He was sentenced to life plus five years for the convictions. Petitioner appealed and this Court affirmed the conviction. *State v. Maraschiello*, 88 S.W.3d 586, 590 (Tenn. Crim. App. 2000). Over 19 years ago, Petitioner filed a petition for post-conviction relief alleging various grounds for relief including ineffective assistance of counsel. Petitioner sought funding for a medical and psychological expert in 2005, and the post-conviction court denied the request. The post-conviction court granted Petitioner permission for an interlocutory appeal. This Court denied the application for permission to appeal. *State v. Michael F. Maraschiello*, M2007-01968-CCA-R9-CO, at *2 (Tenn. Crim. App. Sept. 26, 2007) (order). After multiple amended petitions that included dozens of claims, the post-conviction court denied relief to Petitioner in 2019. On appeal, Petitioner argues that the evidence weighs against the post-conviction's court finding that Petitioner was not a credible witness, that he has a constitutional or statutory right to state funded experts and investigators, that the post-conviction court erred by denying Petitioner the ability to prove his claims by refusing to allow Petitioner to call sixty-nine witnesses, that the post-conviction court erred when it rejected Petitioner's claim that he clearly accepted a plea offer, and that trial counsel provided ineffective assistance of counsel by failing to call or impeach witnesses. After a thorough review of the very lengthy record, we affirm the decision of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, J. and W. NEAL MCBRAYER, SP. J., joined.

James A. Simmons, Hendersonville, Tennessee, for the appellant, Michael F. Maraschiello.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Arthur Beiber, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**


In April of 1995, the Montgomery County Grand Jury indicted Petitioner for first degree murder, arson, possession of an explosive weapon, possession of a shotgun with an altered serial number, and theft in conjunction with the death of his estranged wife. *Maraschiello*, 88 S.W.3d at 590. After a jury trial in 1997, Petitioner was convicted as charged. Petitioner received a life sentence for the first degree murder conviction, a two-year sentence for the arson conviction, a two-year sentence for the possession of an explosive weapon conviction, a six-month sentence for the possession of a shotgun with an altered serial number conviction, and a six-month sentence for the theft conviction. Each sentence was ordered to be served consecutively. *Id.*

On direct appeal, Petitioner challenged the trial court's denial of his motion to suppress his confession to police, the trial court's grant of permission for Petitioner's accomplice, Timothy Winston, to testify as a witness for the State, the trial court's exclusion of testimony concerning Petitioner's mental state and his ability to form the intent necessary to commit first degree murder, and the trial court's decision to impose consecutive sentencing. *Id.* at 600-610. This Court affirmed the judgment of the trial court. *Id*. at 611.

*Trial*


Petitioner's convictions arose from his planned killing of his estranged wife, Roxie Maraschiello, on February 16, 1995, at her home in Clarksville, Tennessee. Petitioner has never denied his role in the killing of the victim. Petitioner served as a captain in the United States Army, ultimately commanding a company during the Persian Gulf War. Petitioner felt that the victim had a difficult time adjusting to life as a military officer's wife. Petitioner claimed that his relationship with the victim suffered because the victim had psychological problems that stemmed from her being raped by her previous husband. Petitioner stated that he married "someone who needed more care and help than I did or had some major problems." *Id.* at 590. Petitioner felt the victim was engaged in behavior that "wasn't acceptable in terms of a normal relationship." *Id.*

Following the Persian Gulf War, Petitioner was assigned to Fort Campbell, where he began to receive poor performance reviews. *Id.* at 591. Petitioner recounted that the

victim increasingly neglected her family obligations to pursue a social life elsewhere. In early 1993, the victim filed a complaint with the Fort Campbell Family Advocacy Program. She alleged that Petitioner abused her both mentally and physically. The victim, with Petitioner's assistance, later drafted affidavits that recanted the abuse claims. *Id.*

Following his honorable discharge from the Army in 1993, Petitioner continued to serve in the United States Army Reserve. Petitioner obtained employment with the Nashville Metropolitan Police Department. *Id.* Petitioner underwent a psychological examination in connection with his police department employment. While nothing significant stood out, the psychologists noted "a defensive gruffness that bordered on anger" and "some adjustment problems and behavior traits which cause[d] [Petitioner] difficulties in relating to others." *Id.* While at the police academy, Petitioner was subjected to several disciplinary actions. After his graduation from the police academy, Petitioner's training officers noted that Petitioner resisted orders and that Petitioner found it difficult to draft objective incident reports. Petitioner was described as argumentative and had definitive opinions about how things should be done. Petitioner would not accept any criticism or supervision, and his employment with the police department was terminated in 1994. *Id.*

The victim initiated divorce proceedings in October 1994. Petitioner filed a petition for an order of protection that alleged the victim threatened to kill him and the victim owned a pistol. In November 1994, Petitioner's eldest daughter reported that Petitioner sexually abused her. Due to insufficient evidence the sexual abuse investigation was discontinued. Following the divorce filing and abuse allegations, the victim moved to Clarksville with the children. *Id.* at 592. The victim refused to tell Petitioner her address. In December 1994, the court issued a restraining order that restrained both parties from harassing each other or making threats of violence. Because there was insufficient evidence to support the sexual abuse claims, the court granted Petitioner unsupervised visitation. At trial, Petitioner denied that he abused his children and that he believed that the victim was abusing them. Petitioner believed the victim was unfaithful to him during their marriage. These beliefs led to Petitioner's decision to murder the victim and "rescue the children." *Id.*

In January 1995, Petitioner approached Timothy Winston and offered to pay him $10,000 if he would assist Petitioner in the murder of the victim. *Id.* Mr. Winston agreed; Petitioner paid him $5000, and they began to formulate their plan. Petitioner purchased the 12 gauge that was used as the murder weapon. He removed the serial number and shortened the barrel length. Petitioner stole the car that he used for transportation during the commission of the murder. Petitioner prepared incendiary devices to destroy the car after the murder. *Id.*

The night of February 16, 1995, Petitioner placed the shotgun, ammunition, binoculars, a police scanner, and the incendiary devices into the stolen car. Petitioner drove to the victim's place of employment, and Mr. Winston followed Petitioner in another car. Mr. Winston also had a police scanner and a change of clothes for Petitioner. Petitioner observed the victim drive out of the parking lot, and he and Mr. Winston began to follow her. Mr. Winston became separated, but Petitioner continued to follow her successfully to her home. *Id.* at 593.

The victim's roommate, Linda Hubenthal, and the victim's boyfriend, Tommy Piper, were inside the home. The victim's daughters were asleep in a rear bedroom of the home. Ms. Hubenthal and Mr. Piper heard the victim arrive home and attempt to open the door but the security chain was fastened. Before Mr. Piper could unfasten the chain, he heard the victim say, "[W]hat the hell do you want." *Id.* Mr. Piper said he then heard loud noises. Several pellets penetrated the front door. Mr. Piper heard the victim scream for help. In a statement to police, Petitioner recalled that upon arrival to the victim's home, he got out of the car with the shotgun, followed the victim to the porch, aimed the shotgun, and pulled the trigger. He missed on the first shot and hit the door. He then shot three or four more times from a distance of about fifteen feet. The victim died as a result of the shotgun wounds. *Id.*

Medical testimony concluded that the victim was shot in the abdomen from a distance of ten or twenty feet and the victim's chest from a distance of six feet or less. The victim was also shot in the head. This wound appeared to be a "contact wound," inflicted when the muzzle of shotgun was in contact with the victim's head. *Id.*

After the murder, Petitioner left the victim's home in the stolen car. He encountered Mr. Winston on the way out of the victim's neighborhood. Mr. Winston followed Petitioner to Frost Auto Alignment in Clarksville. Petitioner parked the stolen car, placed the incendiary devices around it, and ignited one of the devices. Petitioner got into Mr. Winston's car and they drove towards Nashville. Petitioner changed into clean clothes. The pair took a "circuitous" route from Clarksville to Nashville, and Petitioner threw various incriminating items out the car window along the way. *Id.*

On their way to Nashville, Trooper Timothy Dover conducted a traffic stop of the vehicle. Deputy Randall Anderson assisted in the stop. The Clarksville Police Department had not issued a "BOLO" for Petitioner at this point. Accordingly, after he checked Mr. Winston's driver's license and issued a traffic ticket, Trooper Dover allowed Petitioner and Mr. Winston to depart. *Id.* After the stop, Petitioner and Mr. Winston drove to the Sycamore Creek Bridge on Highway 49. At the bridge, Petitioner removed the barrel from the shotgun, exited the car with the remaining shotgun components and

threw them into the creek. Before Petitioner returned to the car, Deputy Anderson approached the bridge, and Mr. Winston drove away. *Id.* at 594. Deputy Anderson stopped his car on the bridge and asked Petitioner what he was doing. Petitioner told Deputy Anderson that he needed to "relieve himself" and that Mr. Winston drove away as a joke. *Id.* Petitioner asked Deputy Anderson to pursue Mr. Winston and ask him to return to the bridge. Deputy Anderson pursued Mr. Winston, and at the same time, Deputy Anderson radioed Trooper Dover and asked him to drive to the bridge and further question Petitioner. *Id.*

Trooper Dover found Petitioner walking along the road about 300 feet from the bridge. He stopped his car and requested Petitioner's identification. Petitioner repeated the same story he told Deputy Anderson. Meanwhile, Deputy Anderson detained Mr. Winston. In contrast to Petitioner's story, Mr. Winston claimed Petitioner was a hitchhiker, and he left him at the bridge to "get rid of him." *Id.* Ultimately, Mr. Winston admitted that he knew Petitioner. Deputy Anderson again radioed Trooper Dover, apprised him of Mr. Winston's location, and Trooper Dover drove Petitioner to that location. Trooper Dover and Deputy Anderson checked Mr. Winston's and Petitioner's driver's licenses with "NCIC." The officers found nothing, and Mr. Winston and Petitioner were allowed to depart. During the encounter, Deputy Anderson saw the barrel of a shotgun in the backseat of Mr. Winston's car. *Id.*

After a preliminary investigation into the victim's murder, Detective Allan Charvis of the Clarksville Police Department learned that Petitioner and the victim were engaged in a "heated divorce." *Id.* Detective Charvis also learned that the victim was "hiding" from Petitioner. The Clarksville Police Department issued a "BOLO" for Petitioner. Immediately after the "BOLO" issuance, Trooper Dover and Deputy Anderson notified Detective Charvis that they had encountered Petitioner en route from Clarksville to Nashville sometime after the murder. Detective Charvis relayed the information to Detectives Mason and West of the Nashville Metropolitan Police Department. Detective Charvis learned that Petitioner was previously employed by the Nashville Metropolitan Police Department. Detectives Mason and West proceeded to Petitioner's home. *Id.* at 595. Detective Mason erroneously believed that a warrant was being issued for Petitioner's arrest. *Id.*

Petitioner denied police access to the house. He was arrested and given *Miranda* rights. *Id.* Trooper Dover eventually arrived on the scene and identified Petitioner as one of two men he encountered earlier. Petitioner admitted to police that he "killed her." *Id.* at 596. Detective Bernard observed that Petitioner exhibited no remorse during the interview. Petitioner told police where he disposed of items used during the murder, including the stolen car and the gun. Petitioner and Mr. Winston were taken to the Clarksville Police Department, and Petitioner provided a written confession. On

September 28, 1995, the State notified Petitioner of its intent to seek a sentence of life imprisonment with parole.

At trial, the State relied heavily on Petitioner's statements to the police. Petitioner testified on his own behalf and admitted that he killed the victim. In his defense, however, Petitioner put forth testimony to support the theory that he did not possess the mental capacity or the requisite mental state for first degree murder. Kevin Wilkinson, a pastor, captain in the Tennessee Army National Guard, and self-described amateur in the field of psychology, testified that he visited with Petitioner on March 2, 1995. *Id.* at 596-98. Mr. Wilkinson described Petitioner's speech as "flighty." He also said that Petitioner "frequently departed from the stream of thought." Additionally, Mr. Wilkinson believed that Petitioner possessed a "very, very tenuous, a very fragile connection with reality." *Id.* at 598. Mr. Wilkinson concluded that Petitioner suffered from "residual effects of a psychotic episode." *Id.* He compared Petitioner's condition to soldiers coming back from war, otherwise known as "battle fatigue." *Id.*

Dr. Pamela Auble, a clinical psychologist, also testified on Petitioner's behalf. She examined Petitioner on two separate occasions and reviewed Petitioner's mental health records from various places. According to Dr. Auble, Petitioner suffered from a delusional disorder, post-traumatic stress disorder, and depression. She concluded that,

> due to [Petitioner's] delusional disorder, his intent to commit . . . [the murder of his wife] was really on a false date base. He—what he believed and what was true were two different things. So that [Petitioner] was like living in a nightmare. He thought that he could see how evil this other person was and nobody else could see it. [Petitioner] acted as if—he believes that his beliefs were true. His beliefs were that this was someone who was abusing and neglecting their children, sexually, physically, and emotionally, and that she was in essence, a prostitute. So his actions were based on his belief that all that was true.

*Id.* Dr. Auble conceded that Petitioner was not insane at the time of the offense. She further concluded that Petitioner was competent to stand trial.

Dr. William Kenner, a psychiatrist, also testified on Petitioner's behalf. He interviewed Petitioner and reviewed numerous records, including Dr. Auble's. He concurred with Dr. Auble's conclusions. Dr. Kenner opined that Petitioner's delusional disorder impacted the ability of Petitioner to "form intent in that his basis for his action was defective[,] and he was operating not with a full deck." *Id.* at 599.

In rebuttal, the State presented the testimony of Dr. Sam Craddock, a psychologist employed by the Middle Tennessee Mental Health Institute ("MTMHI"). Petitioner was admitted to MTMHI in July 1995 and was evaluated for approximately one month. As a result, Dr. Craddock diagnosed Petitioner with a narcissistic personality disorder. Dr. Craddock conceded that psychological testing did not support his diagnosis but noted that Petitioner's responses to testing were inconsistent with observations. Dr. Craddock opined that Petitioner was not insane at the time of the offense and that he was competent to stand trial. Dr. Craddock concluded that Petitioner was capable of forming the requisite mental state for first degree murder, at the time of the murder. *Id.* Dr. Rokeya Farooque, a psychiatrist, also employed MTMHI, concurred in Dr. Craddock's opinion. *Id.* at 600. Dr. Farooque also rejected Dr. Auble's and Dr. Kenner's diagnosis. She explained that interviews with Petitioner's friends and family had revealed that Petitioner's beliefs regarding his wife were based in reality. *Id.* at 600.

*Post-Conviction*

Petitioner filed a petition for post-conviction relief in November 2001. Post-conviction counsel was appointed to represent Petitioner. Through a series of multiple attorneys and pro se representation, Petitioner filed multiple amended petitions and made dozens of claims, most of which alleged that Petitioner received ineffective assistance of counsel. In 2005, Petitioner requested funds for experts to rebut proof presented at trial. The post-conviction court denied Petitioner's request but stated that "[h]ad [Tennessee Supreme Court] Rule 13 provided for an exception to the blanket denial where the petitioner is indigent, the [c]ourt finds this case warrant[ed] the approval of funding." However, the post-conviction court found no such exception in Rule 13. The post-conviction court granted Petitioner permission to appeal the ruling. This Court denied the application for appeal. *Michael F. Maraschiello*, M2007-01968-CCA-R9-CO, at *2 (Tenn. Crim. App. Sept. 26, 2007) (order).

The initial post-conviction judge retired, and the matter was taken up by another post-conviction judge. The first evidentiary hearing was held on May 9, 2018. Assistant District Attorney Art Beiber testified that all files related to Petitioner's trial were housed in the county courthouse and were likely destroyed in a tornado in 1999. Mr. Beiber stated that it was common practice to plea bargain with defendants but no offer was accepted in this case.

Charles Bloodworth, Petitioner's first appointed counsel, testified that he was assigned to Petitioner's case in April 1995. Mr. Bloodworth gave Petitioner's file to the successor attorney, Ed DeWerff, and Mr. Bloodworth retained nothing from it. Petitioner was arrested in February 1995, and his case was bound over to the grand jury by General Sessions Court. Mr. Bloodworth recalled that he met with Petitioner on several

occasions, but he did not recall meeting with Petitioner in February 1995. Mr. Bloodworth recalled that he met with Petitioner on several occasions. Mr. Bloodworth was aware of Petitioner's military service but did not request his military records. Mr. Bloodworth was aware that Petitioner was a former police officer in Nashville. Mr. Bloodworth's request that Petitioner be evaluated at MTMHI was granted. MTMHI required a thirty-day minimum residential stay for their evaluation. Mr. Bloodworth did not recall meeting with Petitioner at MTMHI. He recalled that he met with only two clients at MTMHI during his entire career. Mr. Bloodworth recalled that it was a matter of general practice to tell Petitioner that many cases are often resolved by plea agreements. Mr. Bloodworth did not recall any specific plea agreement discussion with Petitioner. He was Petitioner's attorney during the initial stages only and kept Petitioner apprised of any developments. Mr. Bloodworth recalled that he told Petitioner that he had been indicted by the grand jury, that Petitioner needed a psychiatric exam, and that they would "need to wait until the discovery comes in, then we can see whether or not a plea negotiation would result in something favorable to you."

Mr. DeWerff began representing Petitioner after Mr. Bloodworth was relieved. He did not recall if he represented Petitioner at a suppression hearing regarding Petitioner's statement to police. Mr. DeWerff did not recall if he requested funds for a mental health expert. Mr. DeWerff recalled that he presented a plea offer of fifty-five years at forty-five percent to Petitioner in writing. Petitioner refused the offer and refused to sign the document. Mr. DeWerff turned his files over to Debra Wall when he was relieved from Petitioner's case and Ms. Wall was appointed. On cross-examination, Mr. DeWerff recalled that he filed a motion to suppress Petitioner's confession.

Petitioner testified about his educational background and his time spent in the military. Petitioner testified that he was honorably discharged in October 1993. Petitioner recalled that he first met Mr. Bloodworth at the Montgomery County Jail on February 19, 1995. Petitioner stated that he next met with Mr. Bloodworth on April 27, 1995. Petitioner recalled that Mr. Bloodworth "laid the file out in front of me and he went over it and recommended to me the State's plea." Mr. Bloodworth stated that the plea agreement was for "second degree [murder], twenty-five years at thirty percent." Petitioner claimed that Mr. Bloodworth had a plea document with him but Petitioner did not review it. Petitioner told Mr. Bloodworth that he would think about the offer for a day or two. Petitioner claimed he sent a letter to Mr. Bloodworth the following day accepting the plea offer. Petitioner testified that he did not receive a response from Mr. Bloodworth. Petitioner filed a pro se "Motion to Formalize Preliminary Plea Motion" on June 1, 1995. In the sworn but un-notarized affidavit attached to the motion, Petitioner outlined the plea agreement he stated that Mr. Bloodworth conveyed to him. Petitioner claimed that he never rejected the offer. Petitioner recalled that Mr. Bloodworth met with him at MTMHI on July 7, 1995. Mr. Bloodworth conveyed to Petitioner that the State

was not seeking the death penalty but they were seeking a sentence of life without parole. Petitioner recalled that he asked Mr. Bloodworth about the plea agreement they discussed on April 27. Petitioner testified that Mr. Bloodworth "said we [were] not going to discuss that today." Petitioner never met with Mr. Bloodworth again and subsequently wrote a letter to the Tennessee Board of Professional Responsibility. Mr. Bloodworth was relieved as Petitioner's first appointed counsel, and Mr. DeWerff was appointed. Petitioner rejected the plea offer of fifty-five years that Mr. DeWerff presented to him. Petitioner went to trial and received a life sentence with the possibility of parole. Petitioner insisted that he was prejudiced by the failure of Mr. Bloodworth to communicate his acceptance of the initial plea offer to the State.

Orest Logusz testified that he met Petitioner when they both served in the military in 1984. Mr. Logusz did not hear from Petitioner for several months in early 1995, so he placed a call to Petitioner's mother in New York just before Easter. Mr. Logusz gave her his contact information. Petitioner wrote Mr. Logusz a letter. Mr. Logusz received the letter on April 18 that was dated April 14. Mr. Logusz called the Clarksville "legal aid" office and was given Mr. Bloodworth's name and phone number. Mr. Logusz called Mr. Bloodworth's office and spoke with a paralegal on April 21. Mr. Logusz testified that the paralegal mentioned "a plea [was] in the works." Mr. Logusz wrote Petitioner a letter and told him that a plea agreement was in the works and to accept the offer. Mr. Logusz recalled that he spoke to Mr. Bloodworth toward the end of April. Mr. Bloodworth requested that he send a "character letter." Mr. Logusz mailed a letter dated May 29. Petitioner told Mr. Logusz that he was willing to take the plea offer. Petitioner subsequently voiced his frustration to Mr. Logusz about Mr. Bloodworth's lack of communication. On cross-examination, Mr. Logusz stated that he knew what had happened but did not know what the exact charge was.

At a motions hearing on October 2, 2018, Petitioner again raised the issue of funds to hire expert witnesses. The post-conviction court again denied Petitioner's motion for funds. Petitioner also filed a motion to subpoena out-of-state witnesses. Petitioner requested that he be allowed to call seventy-one witnesses. Post-conviction counsel went down a list of names and stated what each witness would testify about if called at the post-conviction hearing. Petitioner stated that he had more detailed information about each proposed witness. The post-conviction court agreed that the information could be filed with the court. The post-conviction court stated "I would suggest to prepare for the [November] 7th hearing, so it's not a bust, to go ahead and, you know, work on those witnesses who are local."

At the November 7, 2018 evidentiary hearing, Clifford McGown testified that he represented Petitioner during his direct appeal. Mr. McGown did not have independent recollection of a letter he wrote to Petitioner about Petitioner's pre-sentence report. The

letter was entered into evidence and stated that "the way your pre-sentence report was handled is, to put it mildly, unfortunate. . . . Your attorney should have taken steps to ensure the report was accurate as well. Obviously that was not done in your case."

Mr. Bloodworth testified again that he represented Petitioner for about five months in 1995. Mr. Bloodworth agreed that no one from his office went to Petitioner's home to obtain documents or evidence. He again reiterated that he did not visit Petitioner at MTMHI. Mr. Bloodworth did not retain any files that related to Petitioner's case but sent them all to Mr. DeWerff.

Mr. DeWerff testified again that he briefly represented Petitioner. He had no independent recollection of conducting a suppression hearing but agreed that if the record showed that he did it was probably correct. Mr. DeWerff did not recall if he conducted any investigation. Mr. DeWerff did not obtain any experts with regard to Petitioner's mental capacity. Mr. DeWerff did not recall that he received Petitioner's divorce file but did not dispute that he did. When asked about Petitioner's file, Mr. DeWerff stated that his "normal practice is to give the entire . . . file to whoever the next attorney is." He acknowledged that he did not have any files from Petitioner's case in his possession at the time of the post-conviction evidentiary hearing. On cross-examination, Mr. DeWerff confirmed that he would not dispute testimony that he recommended mental health experts or an investigator to Ms. Wall. On redirect-examination, Mr. DeWerff stated that "[Petitioner] was very difficult for me to get along with. I had a hard time communicating with him. But I don't recall exactly whether I had some sort of lay person's opinion as to his competency or sanity."

Petitioner again testified about his education and military background. Petitioner testified that he met the victim at a house party. Petitioner stated that when he returned from the Gulf War, he started to have physical problems. In 1992, Petitioner was diagnosed with "a chemical imbalance in the brain[,] and I had to have a rhinoplasty operation." He stated that he was exposed to toxic chemicals in the Gulf War. Petitioner was employed as a police officer with the Nashville Metropolitan Police Department. Petitioner was unaware, until after his conviction, that he failed multiple psychological tests administered by the Nashville Metropolitan Police Department and the Louisville, Kentucky Police Department. Each test showed that Petitioner was psychologically unfit to be a police officer. Petitioner recalled the demise of his relationship with the victim, explaining that the couple had two children and that the victim filed for divorce in October 1994. When the victim filed for divorce, she moved to Clarksville with the children. In 1990, there was an investigation into suspected sexual abuse of one of Petitioner's daughters, but no evidence was found. Petitioner filed an order of protection against the victim because "she was a - - a rape victim with - - PTSD," and she was in possession of a gun and threatened to shoot Petitioner. In November 1994, Petitioner's

oldest daughter alleged that she was sexually abused. Petitioner cooperated with the investigation. Detective Steven Cleek with the Metropolitan Nashville Police Department investigated the allegations. The allegations could not be proved, and Petitioner was awarded unsupervised visitation with his children. During one visitation, Petitioner testified that his youngest daughter pulled up her shirt and showed him whip marks on her back from her babysitter. Petitioner stated that one of his daughters told him that a couple at her mother's home had sex in front of her. Petitioner stated that his daughters' school grades suffered and that his youngest daughter had reverted back to sucking her thumb. Petitioner stated that his oldest daughter begged him to take them away from the victim.

Petitioner testified that he lived in Nashville at the time of the murder. He communicated with his daughters by phone. Petitioner stated that, to his knowledge, that no attorney or investigator obtained his phone records. Petitioner testified that he went to the Detective Cleek to ask for help in getting his children away from the victim. Detective Cleek told Petitioner that more evidence was needed.

Petitioner then testified as to what happened the night of the murder. He testified that no attorney showed him photos of the crime scene or autopsy. Petitioner stated that the initial medical examiner stated that the victim was shot in the back and indicated no head wound. Petitioner learned later that there was an open casket funeral, "so there's no way the brains could have been blown out, or the head blown off, or a contact wound" as Dr. Charles Harlan's report had indicated at trial.

Petitioner stated that his statement to police the night of his arrest was coerced. Petitioner claimed that he had substantial assets at the time and that on the advice of his attorney, he assigned all assets to his children's grandparents. After assigning over his assets, Petitioner was indigent.

Petitioner testified that he was at MTMHI for approximately 28 to 30 days. During that time, Mr. Bloodworth visited with him. Mr. Bloodworth gave him a document that said the State was seeking a sentence of life without parole. Petitioner asked about the earlier plea offer, and claimed that Mr. Bloodworth said "We're not going to talk about that today." Petitioner stated that no one investigated his military records, and to his knowledge, no one spoke to his family. The front page of MTMHI's report on Petitioner stated that "[a] substantial portion of information [Petitioner] gave the evaluation team members was not checked of its accuracy." Petitioner testified that he gave MTMHI a list of military personnel with whom he served. To Petitioner's knowledge, MTMHI did not interview any of them, although one of them visited him twice while he was at MTMHI.

Petitioner testified that Mr. DeWerff represented him at his suppression hearing. Mr. DeWerff did not obtain the services of any mental health expert. After the suppression hearing, Ms. Wall was assigned to Petitioner's case. Petitioner had no reason to believe that Ms. Wall did not receive all of his files from Mr. DeWerff. Petitioner relayed all information about his illnesses and military experience to Ms. Wall. Petitioner requested that Ms. Wall "at least investigate and get experts in these areas." Petitioner testified that he was consulting with Joyce Riley, a nurse, and Steve Welch about his Gulf War Syndrome. Petitioner stated that Ms. Riley was an expert in the signs and symptoms of the syndrome. Ms. Riley requested a blood draw. Dr. Garth Nicholson drew Petitioner's blood which tested positive for "mycoplasma incognitus," a "known chemical and it's a tuberculosis that Saddam's chemicals that he had over there would produce." Petitioner stated that he was then quarantined for twenty-eight days in Nashville. Ms. Riley contacted Dr. Nicholson and told him to expect a phone call from Ms. Wall. Ultimately, Dr. Nicholson was not called to testify at trial.

Petitioner cooperated with Dr. Auble and Dr. Kenner's examinations. Petitioner was never examined by a medical doctor in preparation for trial. Petitioner testified that Dr. Kenner's report stated

> based upon . . . the very recent medical literature available, it is my opinion that [Petitioner] must be evaluated for G[u]lf War Syndrome, to determine if there exists a biological basis for his behavior and actions, rather than a purely functional one.

Dr. Auble's report stated that Petitioner's "behavior might have been influenced by [Gulf War] biological syndrome, rather than being solely due to psychological causes." No additional biological exams were conducted in conjunction with the recommendations. Petitioner was aware that an ex parte motion was filed that sought additional funds for payment of psychiatrist and psychologist regarding a Gulf War Syndrome expert and false accusations of child sexual abuse, but nothing was filed in support of the motion. To Petitioner's knowledge, no hearing was held, and he never signed anything that excused his presence from such a hearing. Petitioner requested a motion be filed for a medical exam, and claimed this motion was never filed. Ms. Wall sent a letter to Petitioner that stated "[t]he court denied both the motion for G[u]lf War Syndrome and the motion for an expert on the effects of false accusations of child sexual abuse." To Petitioner's knowledge, no proof was submitted as to either motion.

Petitioner testified that Steven Haggey, the victim's ex-husband, wrote a letter to Petitioner's divorce attorney regarding the victim. The letter described the victim's "symptoms, and character, and behavior, that she displayed for the entire [ten] years that I was married to her." Petitioner testified that Ms. Wall had a copy of the letter but Mr.

Haggey was not called to testify at trial. Petitioner stated that Ms. Wall never gave him copies of crime scene photos or the crime scene diagram.

Petitioner presented a copy of the Department of Veterans Affairs' (VA) rating for his service related Post-Traumatic Stress Disorder and the compensation he received. Petitioner presented copies of letters that were sent to his divorce attorney. One such letter, from Petitioner's brother, recalled that the victim wanted to have an affair with him and went in to further detail about possible child sexual abuse allegations. Petitioner submitted other letters as well, none of which were used at trial, and none of the writers were called to testify.

Petitioner felt he was disadvantaged as a service member during jury selection and requested a jury question asking if any enlisted soldiers were in the jury pool. The question was not asked to the panel, although two active duty enlisted men were ultimately seated on the jury. Petitioner felt it was highly prejudicial that Ms. Wall referred to him as a Yankee during voir dire because the victim was a southerner. Petitioner asked that his oldest daughter testify. Ms. Wall refused and told Petitioner that "she was not going to be the attorney to tell the jury [through the daughter's testimony] about [the victim] being a monster and her character contributing to her death." Petitioner stated that he still speaks to his oldest daughter and that she "talks about the abuse suffered at the hands of her mother[,] and she knows that I've been wronged."

Prior to the final evidentiary hearing, the post-conviction court issued an order denying Petitioner's motion to subpoena sixty-nine of the seventy-one proposed witnesses. The post-conviction court found that Petitioner could subpoena Charles Wheeler and Rockelle Daniels. The post-conviction court found that their testimony may be relevant. As to the remaining proposed witnesses the post-conviction court found "that all other potential witnesses listed by [Petitioner] shall not be called as witnesses in the post-conviction proceedings as their testimony would be irrelevant or cumulative." The post-conviction court further found that the status of Petitioner's mental health was litigated at trial and that Petitioner did not have the right to have it relitigated.

At the final evidentiary hearing on November 29, 2018, Ms. Wall testified that she received Petitioner's files from Mr. DeWerff. Ms. Wall and Mr. DeWerff spoke at length about the suppression hearing that Mr. DeWerff conducted. Mr. DeWerff chose an investigator, Mr. Wheeler, and Ms. Wall continued to work with him on Petitioner's case. Mr. DeWerff started conversations with Dr. Auble and Dr. Kenner as well. Ms. Wall testified that Petitioner provided "lists and lists of witnesses that he thought were very germane to the case." Ms. Wall and Mr. Wheeler spent hours trying to decide which witnesses to interview. It was Mr. Wheeler's job to find the witnesses, talk with them, and then if the witness was germane, Ms. Wall would speak with them. Ms. Wall

testified that Petitioner wanted her to track down and interview "well over a hundred" witnesses. Ms. Wall agreed that the witnesses she interviewed did not have information that she felt was relevant or helpful in light of Petitioner's confession. Ms. Wall stated that Mr. Wheeler found many witnesses that knew relevant information but the information was not helpful to Petitioner. Ms. Wall believed the only relevant witnesses that testified were the "mental health folks." Ms. Wall explained

> First of all, we [had] a confession and [Petitioner] had admitted killing his wife. [Petitioner] made it very clear for me from day one, this was his trial and he would take the stand[,] and he was going to tell the jury why he killed his wife, so there was not a guilt/innocence issue. It was - - we had to explain why he killed his wife and using the mental health experts to do that was his best shot.

Ms. Wall testified that the defense was hoping to show diminished capacity in order to have a second degree murder conviction instead of a first degree murder conviction. Ms. Wall recalled Petitioner's blood test and stated that the next step would be for Petitioner to be evaluated at the VA. Ms. Wall set up two exams for Petitioner at the VA. Petitioner refused to be transported to the first exam because he was not shackled in a certain way. The exam was rescheduled, and the jail forgot to transport Petitioner to the VA. The second exam was scheduled, and Ms. Wall received a phone call the day before the exam and was told that Petitioner, through a friend, cancelled the exam. Petitioner told Ms. Wall that he cancelled the exam because "it would always be an issue for his appeal." Ms. Wall explained to Petitioner and Ms. Riley that a nurse was not allowed to testify in Tennessee as to a diagnosis or causation. Ms. Wall called Ms. Riley to testify, but the trial court declined to allow Ms. Riley's testimony. On cross-examination, Ms. Wall did not recall if she spoke with Dr. Nicholson. Ms. Wall recalled an ex parte meeting with the trial court. She did not recall whether Petitioner asked that his presence be excused or whether he made a written waiver. Ms. Wall recalled that at the time when the trial court had an ex parte meeting it was in chambers. Ms. Wall did not recall if she visited the crime scene. Ms. Wall did not recall if Petitioner received a physical examination. Ms. Wall indicated that things were done much differently in the 1990's. The trial court had an open door policy, and she would go ask questions. Ms. Wall recalled that the trial court "would not grant a Gulf War expert until I showed him some evidence that [Petitioner] had it[,] and I couldn't get that evidence from [Petitioner]." Ms. Wall testified that she received funds for three experts. Ms. Wall testified that the reason Petitioner was to be examined at the VA was because of Dr. Kenner's report. Ms. Wall was aware of the psychological tests from the Nashville and Louisville police departments. Ms. Wall recalled that she filed suit to obtain the Nashville results but could not recall if she was successful. Ms. Wall did not request a pathologist to examine Dr. Harlan's work. Ms. Wall recalled that there were problems with Dr. Harlan's work

- 14 -

as a pathologist at the time. She did not request funds for an additional pathologist because Petitioner admitted that he shot and killed the victim. There was no issue as to what killed the victim.

On July 15, 2019, the post-conviction court entered an encyclopedic, and yet cogently written, 72-page order denying the petition for post-conviction relief. The post-conviction court found that it was bound by the Tennessee Supreme Court's "orders, rule[s], and precedents" and concluded that Petitioner was not entitled to relief in regards to additional funding for expert witnesses. The post-conviction court found that sixty-nine of seventy-one witnesses' testimony would be irrelevant or cumulative. The post-conviction court found that Petitioner was not a credible witness and specifically found that each of Petitioner's previous attorneys were credible. The post-conviction court aptly addressed each issue raised by Petitioner and found that Petitioner failed to establish that he received ineffective assistance of counsel. The post-conviction went on to find that Petitioner waived several issues from his petition for post-conviction relief because the issues were either not raised on direct appeal, previously decided, or no proof was presented at the post-conviction evidentiary hearing. It is from that denial that Petitioner now appeals.

*Analysis*

On appeal, Petitioner presents six issues for review. He argues: (1) that the preponderance of the evidence weighs against the post-conviction court's determination that Petitioner was not a credible witness; (2) that Petitioner was entitled to state funded experts and investigators on post-conviction; (3) that Petitioner's right to compulsory process was violated by the post-conviction court's failure to allow Petitioner to call witnesses at the post-conviction hearing; (4) that the post-conviction court improperly determined that Petitioner did not accept a plea offer; (5) that the post-conviction court erred in finding Petitioner was not a credible witness; and (6) that trial counsel was ineffective for failing to call witnesses at trial to support a crime of passion defense. In our view, many of these issues are interrelated. Therefore, we will address the issues as presented irrespective of Petitioner's numbering.

*Standard of Review*

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or

substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, a post-conviction court's findings of fact are conclusive unless the evidence preponderates otherwise. *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006). Accordingly, questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court, and an appellate court may not substitute its own inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*Denial of Expert Funding*

Petitioner complains that he was denied the constitutional right to a "full and fair post-conviction hearing" because the post-conviction court denied expert funding. While acknowledging that indigent, non-capital post-conviction petitioners are not constitutionally entitled to expert support services at the expense of the State, Petitioner argues that the current law in Tennessee is "fundamentally flawed" and should be reviewed in light of the United States Supreme Court decision in *Martinez v. Ryan*, 566 U.S. 1 (2012). The State, on the other hand, cites *Davis v. State*, 912 S.W.2d 689 (Tenn. 1995), and argues that Petitioner was not entitled to expert services in a post-conviction proceeding.

Tennessee Code Annotated section 40-14-207(b) entitled "Compensation and salaries; necessary services" provides in pertinent part as follows:

> (b) In capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, the court in an ex parte hearing may, in its discretion, determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected. If that determination is made, the court may grant prior authorization for these necessary services in a reasonable amount to be determined by the court. The authorization shall be evidenced by a signed order of the court. The order shall provide for the reimbursement of reasonable and necessary expenses by the administrative director of the courts as authorized by this part and rules promulgated thereunder by the supreme court.

In *Owens v. State*, our supreme court held that Tennessee Code Annotated section 40-14-207(b) applies to post-conviction capital cases. 908 S.W.2d 923, 927-28 (Tenn.

1995).  That same year, in *Davis v. State*, our supreme court noted that "[i]n Tennessee there is no rule or statute that entitles a non-capital post-conviction petitioner to state funded expert assistance."  912 S.W.2d 689, 695 (Tenn. 1995) (citing T.C.A. § 40-14-207(b)).  After examining applicable cases decided by the Supreme Court of the United States, as well as the Tennessee Constitution, our supreme court held that "the state is not required to provide expert assistance to indigent non-capital post-conviction petitioners." *Id.* at 696-97.

> In *Martinez*, the United States Supreme Court held that

> > [w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez*, 566 U.S. at 17.  This Court has recognized that the supreme court's holding in *Martinez* was specifically limited to establishing an equitable exception to federal rules of procedural default in the context of a federal habeas proceeding.  *See Ruben Pimentel v. State*, No. M2011-01309-CCA-R3-PC, 2013 WL 4505402, at *3 (Tenn. Crim. App. Aug. 21, 2013), *no perm. app. filed*.

Here, Petitioner has not presented any reason for this Court to reverse prior precedent and establish a new rule of law allowing a petitioner in a non-capital case to receive state funding for an expert at the post-conviction stage.  Petitioner has presented this issue to this Court before in an interlocutory appeal, and it was rejected.  *State v. Michael F. Maraschiello*, M2007-01968-CCA-R9-CO, at *2 (Tenn. Crim. App. Sept. 26, 2007) (order).  Moreover, we do not see how *Martinez* applies to Petitioner's non-capital case on the issue of expert funding at the post-conviction stage.  Therefore, the post-conviction court properly denied Petitioner's request for funding for a mental health expert witness at the post-conviction stage.  *See Henry Lee Burrell v. State*, No. M2015-02115-CCA-R3-PC, 2017 WL 943363, at * (Tenn. Crim. App. Mar. 9, 2017) (determining that the petitioner, who pled guilty to six counts of first degree murder, was not entitled to a mental health expert at the expense of the state during post-conviction proceedings), *no perm. app. filed*; *Wesley Jones v. State*, No. W2015-01481-CCA-R3-PC, 2016 WL 4357422, at *22 (Tenn. Crim. App. Aug. 11, 2016) (determining the post-conviction court did not err in finding petitioner who was convicted of first degree murder was not entitled to assistance from a DNA expert at the post-conviction hearing), *perm. app. denied* (Tenn. Oct. 21, 2016); *Klein Adlei Rawlins v. State*, No. M2010-02105-CCA-R3-PC, 2012 WL 4470650, at *14 (Tenn. Crim. App. Sept. 27, 2012)

(finding that the post-conviction court did not err in determining that the petitioner, who was convicted of first degree felony murder and aggravated child abuse or neglect in a non-capital case, was not entitled to assistance from an expert at the post-conviction hearing), *perm. app. denied* (Tenn. Feb. 25, 2013); *Sammie Lee Taylor v. State*, No. W1999-00977-CCA-R3-PC, 2000 WL 714387, at *5-6 (Tenn. Crim. App. May 26, 2000) (finding that the post-conviction court did not err in refusing to grant the petitioner assistance from an expert at the post-conviction hearing where the petitioner, who was convicted of felony murder, especially aggravated kidnapping, especially aggravated robbery, and aggravated sexual battery and received a sentence of life without parole plus sixty-two years), *perm. app. denied* (Tenn. Dec. 4, 2000). Petitioner is not entitled to relief on this issue.

## *Cumulative Witnesses*

Next, Petitioner takes issue with the post-conviction court's determination that many of his proposed witnesses were either cumulative or irrelevant. Petitioner insists that the post-conviction court's determination that the witnesses could not testify at the hearing violated his right to compulsory process under the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Petitioner argues that the witnesses were necessary to establish that his trial counsel was ineffective for failing to develop proof at trial to support his theory of defense that the crime was committed in the heat of passion and therefore affected his ability to form the intent to commit murder. The State counters that the post-conviction court properly determined that most of the proposed witnesses were either cumulative or irrelevant.

Prior to the post-conviction hearing, Petitioner filed a motion for "Pre-Trial Determination." This motion listed a total of 71 possible witnesses whom Petitioner wished to call at the hearing. Petitioner then filed an additional motion with "Supplemental Information" for the motion, this time listing 76 witnesses. This motion was filed pro se. As part of this motion, Petitioner included a detailed explanation as to the anticipated testimony of each of the proposed witnesses.

The post-conviction court approved subpoenas for two witnesses, including Ms. Daniels, the Public Defender's investigator, and Mr. Wheeler, the investigator for Ms. Wall, Petitioner's former lawyer. The post-conviction court determined that:

> [A]ll other potential witnesses listed by [P]etitioner shall not be called as witnesses in the post-conviction proceedings as their testimony would be irrelevant or cumulative. The attorneys who represented [P]etitioner have, and can testify regarding their attempts to contact witnesses to testify at trial and defense strategies. The status of [P]etitioner's mental health was

litigated at trial, and thus [P]etitioner does not have the right to relitigate the same in the post-conviction proceedings. Likewise, his character and military record were litigated at trial. Many of the witnesses listed testified at trial.

The post-conviction court mentioned that if the majority of these proposed witnesses testified similarly to how Petitioner explained their proposed testimony, the testimony "would have been cumulative to the testimony offered at trial and by [P]etitioner on post-conviction." The post-conviction court also determined that there was no proof presented that any of Petitioner's counsels were either on notice of these witnesses prior to trial or whether trial counsel had even interviewed them. Petitioner did not present the testimony of Ms. Daniels or Mr. Wheeler at the post-conviction hearing. However, Mr. Logusz testified at the hearing without being subpoenaed.

Under both our state and federal constitutions, a defendant has the right to compulsory process for obtaining witnesses in their favor. *See* U.S. Const. amend VI; Tenn. Const. art. I, § 9; T.C.A. § 4-17-105. The United States Supreme Court discussed the implications of this right as follows:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1976). "Although an accused in a criminal trial has a constitutional right to the compulsory attendance of witnesses under the Sixth Amendment of the United States Constitution, and Article I, Section 9, of the Constitution of Tennessee, the right to compulsory process is not unlimited." *State v. Smith*, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982). The court continued:

> "A court is not required to issue compulsory process for anyone whom accused may designate as a witness; the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible. Within these limitations[,] accused may obtain the attendance of any witnesses he cares to use."

*Id.* (quoting *Bacon v. State*, 385 S.W.2d 107, 109 (1964)). Consistent with this right, Tennessee statutes generally direct the clerks of courts in which criminal cases are pending to issue subpoenas "at any time, to any part of the state, for such witnesses as either the district attorney general or the defendant may require." T.C.A. § 40-17-107(a); *see* Tenn. R. Crim. P. 17(a).

However, a criminal defendant's right to compulsory process is not absolute. The United States Constitution only prohibits a state from denying a defendant the ability to present testimony that is "'relevant and material, and . . . vital to the defense.'" *United States v. Valenzuela Bernal*, 458 U.S. 858, 867 (1982) (quoting *Washington*, 388 U.S. at 16). Therefore, "a court has the power and the duty to prevent abuse of its process by abating subpoenas for witnesses whose testimony would be immaterial." *State v. Womack*, 591 S.W.2d 437, 443 (Tenn. Crim. App. 1979). In reviewing whether a trial court abused its exercise of power and duty to prevent abuse of its process, we apply an abuse of discretion standard. *State v. Connie Easterly*, No. M2000-00077-CCA-R10-CO, 2001 WL 208514, at *7 (Tenn. Crim. App. Mar. 1, 2001), *no perm. app. filed*.

During the lengthy post-conviction proceedings, stretching over a number of years and taking place during several different hearings, Petitioner never set forth any proof as to whether any of the proposed witnesses were interviewed by counsel prior to trial. In fact, there was only proof presented that counsel had knowledge of one witness on the list apart from those witnesses who testified at the trial−Dr. Garth Nicholson. On appeal, Petitioner argues that many of the witnesses would have testified regarding Petitioner's mental problems and/or the victim's mental problems. As evidenced by our recitation of the testimony and proof at trial above, proof on both of these issues was presented to the jury. At trial, Dr. Farooque testified about the victim's mental problems as a rebuttal witness for the State explaining that "interviews with [Petitioner's] friends and family had revealed that [Petitioner's] beliefs concerning his wife, as described by [Petitioner] to the doctor, were based in reality." *See Maraschiello*, 88 S.W.3d at 600. Additionally, Petitioner put forth proof of his own diminished capacity at trial through Mr. Wilkinson, Dr. Auble, and Dr. Kenner. There was proof presented at trial that Petitioner was not entirely connected with reality and suffered from "delusional disorder, post-traumatic stress disorder, and depression." The post-conviction court did not abuse its discretion. Petitioner is not entitled to relief on this issue.

*Ineffective Assistance of Counsel*

Petitioner filed an initial petition alleging ineffective assistance of counsel. Throughout the many years that this case has been pending, Petitioner filed several amended petitions, both through counsel and pro se. In those petitions, he raised various allegations of ineffective assistance of counsel. As noted by the post-conviction court in

its order denying relief, Petitioner abandoned some of these issues by failing to raise them at the hearing on the post-conviction petition. The post-conviction court painstakingly combed through each of Petitioner's amended petitions, determining which issues were abandoned at the hearing. We agree with this assessment. Any issues not raised in the petition and not raised in the post-conviction court are considered abandoned. Likewise, any issues that were raised in the post-conviction court that have not been pursued on appeal are deemed abandoned. *See Ronnie Jackson, Jr. v. State*, No. W2008-02280-CCA-R3-PC, 2009 WL 3430151, at *6 n.2 (Tenn. Crim. App. Oct. 26, 2009) ("While the Petitioner raised additional issues in his petition for post-conviction relief, he has abandoned those issues on appeal."), *perm. app. denied* (Tenn. Apr. 16, 2010).

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. *See Davidson v. State*, 453 S.W.3d 386, 392-93 (Tenn. 2014). In order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two-prong test established by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced the defense. *See State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697). The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). This Court will not use hindsight to second-guess a reasonable trial strategy, even if a different procedure or strategy might have produced a different result. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). However, this deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain relief. The question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694).

### I. Trial Counsel's Failure to Present Witnesses to Support Heat of Passion Defense

To the extent that Petitioner argues trial counsel was ineffective for failing to pursue a "heat of passion" defense by calling witnesses Ms. Wall possibly did not even know about, we note that this defense is antipodean to the diminished capacity defense advanced by trial counsel at trial. Trial counsel is never required to "pursue inconsistent defense theories [in order] to provide constitutionally effective representation." *Felts v. State*, 354 S.W.3d 266, 280 (Tenn. 2011) (determining trial counsel was not ineffective for failing to pursue self-defense and voluntary manslaughter defenses). Though Ms. Wall testified that she and Mr. Wheeler had a list of over 100 names of potential witnesses that they investigated prior to trial, with the exception of Dr. Nicholson, Petitioner failed to show that Ms. Wall was even aware of the existence of the witnesses on the list that he proposed to testify at the post-conviction hearing save those that were called to testify at trial. "[W]ithout information about these potential witnesses, defense counsel could not be expected to contact them" and therefore could not be deemed ineffective for failing to do so. *Jerry Wayne Lankford v. State*, No. E2010-00510-CCA-R3-PC, 2011 WL 1118494, at *6 (Tenn. Crim. App. Mar. 28, 2011), *no perm. app. filed*. Moreover, the proof at trial overwhelmingly established premeditation, so it would have been both irrational and unreasonable for trial counsel to pursue a theory that the murder was voluntary manslaughter. *See Maraschiello*, 88 S.W.3d at 592. Petitioner has failed to show prejudice as a result of trial counsel's failure to call witnesses at trial to support a "heat of passion" defense.

### II. Communication/Existence of Plea Agreement

Petitioner complains that trial counsel was ineffective for failing to communicate to the State his acceptance of an alleged 25-year plea offer to the crime of second-degree murder. Petitioner insists that his testimony on the matter was "clear" and that the facts about the plea agreement are "documented" and that the post-conviction court erred by making the determination that he was not a credible witness.

- 22 -

The right to effective assistance of counsel extends to critical pre-trial stages, including plea bargaining. *Missouri v. Frye*, 566 U.S. 134, 140 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985)); *see also Lafler v. Cooper*, 566 U.S. 156, 162 (2012). During plea negotiations, trial counsel has the duty to promptly communicate and explain any plea offers extended by the State. *Nesbit v. State*, 452 S.W. 3d 779, 800 (Tenn. 2014); *see also Frye*, 566 U.S. at 145 ("[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."). Trial counsel must provide the defendant "with competent and fully informed advice, including an analysis of the risks that the [defendant] would face in proceeding to trial." *Nesbit*, 452 S.W.3d at 800 (quoting *Burt v. Titlow*, 571 U.S. 12, 25 (2013) (Sotomayor, J., concurring)). An evaluation of counsel's performance in advising a defendant whether to accept or reject a plea offer "depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970). As other appellate courts have recognized, "a defense attorney's simple misjudgment as to the strength of the prosecution's case, the chances of acquittal, or the sentence a defendant is likely to receive upon conviction, among other matters involving the exercise of counsel's judgment, will not, without more, give rise to a claim of ineffective assistance of counsel." *Com. v. Mahar*, 809 N.E.2d 989, 994 (Mass. 2004) (quoting *In re Alvernaz*, 830 P.2d 747, 755 (Cal. 1992)). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 690-91).

In order to establish prejudice, a petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694). "In the context of pleas, a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. "Even if the trial itself is free from constitutional flaw, the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence." *Id.* at 166. The Tennessee Supreme Court has adopted the following test for determining prejudice in this context:

> [A] defendant claiming that trial counsel's performance was deficient in the plea negotiations process has the burden to show by a reasonable probability that, but for counsel's deficient representation, (1) the defendant

would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe than the penalty actually imposed.

*Nesbit*, 452 S.W.3d at 800-01 (citing *Lafler*, 566 U.S. at 164).

In this case, the post-conviction court repeatedly determined that Petitioner was not a credible witness. With regard to the plea agreement, the post-conviction court determined that there is "little credible evidence that the State actually made an offer for [Mr. Bloodworth] to communicate." The record includes a pro se motion to "effectuate the offer [Petitioner] insists the State made, but the only person who has presented proof supporting [Petitioner's] contention is [Petitioner]." The post-conviction court continued:

No additional pleadings, order, or hearings regarding the supposed offer appear in the trial court record, and during the post-conviction hearing [Petitioner] was the only person who testified regarding the existence of the 25-year plea deal. This Court does not find Petitioner's testimony credible.

Mr. Bloodworth testified he did not remember if any specific plea offers were made in this case, but at the time counsel represented [Petitioner]— which occurred very early in Petitioner's Circuit Court case—the State was likely still determining whether the State would seek the death penalty. The Court finds Mr. Bloodworth's testimony credible, and based on the tenor of Mr. Bloodworth's testimony, the Court finds it likely that if Mr. Bloodworth had been presented the offer Petitioner insists the State made, counsel would have discussed the deal with Petitioner.

The Court has no reason to doubt Mr. Logusz discussed the possibility of Petitioner's pleading guilty with the Petitioner and Mr. Bloodworth, but no evidence was presented regarding the exact nature of the plea offer Mr. Logusz claimed he discussed with Petitioner and his then-attorney. Mr. Logusz did not state the exact terms of the plea, and neither Mr. Bloodworth nor [Petitioner] was asked about their discussions with Mr. Logusz. Thus, his testimony is unavailing to Petitioner.

The only proof of a plea offer, apart from Petitioner's testimony, was presented by Mr. DeWerff, who memorialized a 55-year plea deal offered by the State around the time of the suppression hearing. Both Mr. DeWerff and [Petitioner] testified that counsel presented this offer to Petitioner, who rejected the proposed deal.

In sum, Petitioner has failed to present credible evidence that the State actually made an offer for the Petitioner to plead guilty to second degree murder and receive a 25-year sentence.

Clearly the post-conviction court determined that Petitioner failed to prove that trial counsel's performance was deficient because Petitioner failed to prove the existence of the 25-year plea offer. An attorney's performance cannot be deficient for failing to convey an offer that never existed.

The post-conviction court found Petitioner failed to prove by clear and convincing evidence the existence of a 25-year plea offer from the State. The evidence in the record does not preponderate against this finding. *See Vaughn*, 202 S.W.3d at 115. The post-conviction court did not accredit Petitioner's testimony regarding this offer, and we will not second-guess such credibility determinations on appeal. *See Honeycutt*, 54 S.W.3d at 766-67. The record does not support a finding that this offer was ever made. Apart from Petitioner's testimony, there was a copy of a letter from Petitioner to counsel outlining the plea deal and indicating his acceptance of the deal and an un-notarized affidavit from Petitioner in the record. There was no proof given as to when this letter was sent or whether Mr. Bloodworth received it. Petitioner also failed to show that the State would not have withdrawn the offer and failed to show that the trial court would have accepted the plea agreement. *Frye*, 566 U.S. at 146. Petitioner claims that the offer was made less than a month after indictment. Because Petitioner failed to establish prejudice under the test set forth by our supreme court in *Nesbit*, he is not entitled to post-conviction relief for ineffective assistance of counsel on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE